# EXHIBIT A

In Re CMS Energy Securities Litigation
Civ. No. 02 CV 72004 (GCS)

Expert Rebuttal Report of Cyril Moscow

October 4, 2006

I.      **Personal Background and Qualifications**

1.      Since 1960, I have practiced business law as a member of Honigman Miller Schwartz and Cohn LLP in Detroit, Michigan, specializing in corporate and securities matters. Since 1973, I have been adjunct professor at The University of Michigan Law School and have taught classes and seminars in corporate governance, securities regulation, enterprise organization and business planning for publicly held corporations. I am the co-author of a treatise on Michigan corporate law, Michigan Corporation Law and Practice (1990 with annual supplements). In my law practice, teaching and national and state bar association activities, I have frequently been involved in issues of corporate governance at corporations with publicly traded securities.

2.      In the past four years I provided expert testimony in the cases listed on Exhibit 1.

3.      My resume is attached as Exhibit 2. I am being compensated for services performed at an hourly basis at the rate of $530 per hour.

II.     **Scope of Analysis**

4.      I have been retained by counsel for CMS Energy Corporation ("CMS") in this litigation to rebut the report presented by plaintiffs' expert Kevin F. Dages. In this regard, I have been asked to address applicable standards of care governing the conduct of directors and officers of a Michigan corporation. The specific matters about which I have been asked to develop independent opinions are: (1) whether it is reasonable for a Michigan corporation and its directors and officers to rely on its outside auditors with respect to accounting for transactions; and (2) whether CMS and its officers and directors acted recklessly in not anticipating that the Securities and Exchange Commission ("SEC") at some point would investigate zero margin trading transactions by CMS's subsidiary, CMS Marketing Services & Trading Company

1

("MS&T"). As a rebuttal expert, I limited my inquiry to the purported facts and opinions presented by plaintiffs' expert Kevin F. Dages in his report submitted in this litigation.

5. In connection with my work, I have called on the knowledge and experience gained during my professional career. My work is continuing, and, therefore, I reserve the right to modify or add to my report. In support of my testimony at trial, I may prepare exhibits based on the information included in this report. I also may use as exhibits any statements, records, documents, evidence, or other exhibits made, issued or introduced by any party.

### III. Materials Considered

6. For this report, I have considered the materials listed on Exhibit 3.

### IV. Summary of Opinions

7. In my opinion, it is reasonable for a Michigan corporation and its officers and directors to rely on the advice of its outside auditors with respect to accounting for revenues and costs, including accounting for zero margin trading transactions.

8. In my opinion, institution of an investigation by the Securities and Exchange Commission of zero margin trading transactions by MS&T did not demonstrate that CMS and its directors and officers were reckless, even if CMS's stock price dropped following the disclosure of the investigation.

### V. Standards Governing The Conduct Of Directors And Officers

#### A. General Duties

CMS is a Michigan corporation. The general duties of directors and officers of a Michigan corporation are contained in section 541a of the Michigan Business Corporation Act, as follows:

2

> Sec. 541a. (1) A director or officer shall discharge his or her duties as a director or officer including his or her duties as a member of a committee in the following manner:
> (a) In good faith.
> (b) With the care an ordinarily prudent person in a like position would exercise under similar circumstances.
> (c) In a manner he or she reasonably believes to be in the best interests of the corporation.
> (2) In discharging his or her duties, a director or officer is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by any of the following:
> (a) One or more directors, officers, or employees of the corporation, or of a business organization under joint control or common control, whom the director or officer reasonably believes to be reliable and competent in the matters presented.
> (b) Legal counsel, public accountants, engineers, or other persons as to matters the director or officer reasonably believes are within the person's professional or expert competence.
> (c) A committee of the board of which he or she is not a member if the director or officer reasonably believes the committee merits confidence.
> (3) A director or officer is not entitled to rely on the information set forth in subsection (2) if he or she has knowledge concerning the matter in question that makes reliance otherwise permitted by subsection (2) unwarranted.

Duties under this section, and directors' and officers' duties under the law of other states, generally are classified as duties of care and loyalty. There is no reference in the Dages report to any conflict of interest or similar matter that would indicate a breach of director or officer duty of loyalty in connection with zero margin trading activity. Allegations of reckless conduct under state law would implicate a breach of the duty of care which, as stated above, in Michigan would mean a breach of the care an ordinarily prudent person in a like position would exercise under similar circumstances. The use of the term "reckless" in this context is discussed below.

In common with courts throughout the country, Michigan courts traditionally have deferred to the business judgment of directors as a standard of judicial review. From the classic case of *Dodge v. Ford* in 1919, to more modern statements, Michigan courts have applied the business judgment rule. Within that framework, directors and officers are given wide discretion

3

in connection with their business operations so long as they act in an informed basis, in good faith, and in the honest belief that the actions taken were in the best interests of the corporation. The facts reviewed here indicate that the reporting of zero margin trading was within the business judgment of the directors as a matter of Michigan law and practice.

Michigan legislative policy also provides director protection from hindsight liability. Pursuant to authority in section 209(c) of the Michigan Business Corporation Act, CMS has included in its articles of incorporation a provision exculpating directors from personal liability to the corporation or shareholders for breaches of the duty of care. Under this provision, directors can only be liable to the corporation or its shareholders in limited circumstances, such as intentional infliction of harm on the corporation or the shareholders. None of the exceptional circumstances are present in this case.

This case involves actions at CMS's wholly owned subsidiary MS&T. As a separate Michigan corporation, MS&T has its own board of directors. In practice, however, the directors of a wholly owned subsidiary in a multi-corporate enterprise like CMS would expect to follow the policies and procedures established by the officers of the parent corporation pursuant to their authority from the parent corporation's board of directors. The separate existence of a wholly owned subsidiary corporation typically is maintained for liability, tax or employment or other administrative purposes, but not for general strategic direction.

**B.   Reliance on Outside Consultants and Advisors**

In operating a complex publicly traded corporate enterprise such as CMS, the board of directors necessarily must rely on outside consultants and advisors. Section 541a of the Michigan Business Corporation Act quoted above specifically authorizes directors and officers in discharging their duties to rely upon public accountants as to matters the director or officer

4

reasonably believes are within the accountants' professional competence. The facts indicate that the CMS financial staff relied upon Arthur Andersen & Co., a respected outside auditing firm with expertise in accounting for energy transactions, concerning the reporting of activities at MS&T. Arthur Andersen certified the financial statements for the year 2000 that included zero margin trading at MS&T and reviewed quarterly reports that accounted for revenues in a similar fashion. It was reasonable for CMS and its directors and officers to rely upon Arthur Andersen for the reporting of MS&T zero-margin trading transactions. To assure themselves of proper reporting for the transactions at a new business enterprise with complex transactions under applicable accounting rules, reasonable directors and officers would be expected to rely on outside accountants' advice. Reliance upon outside auditors was particularly appropriate in this case because CMS and its personnel were not familiar with the details of the trading business conducted by MS&T.

### C.   Oversight Responsibilities and Duty of Inquiry

Under Section 501 of the Michigan Business Corporation Act, the business and affairs of the corporation are to be managed by or under the direction of its board. In practice, oversight duties under this section would include monitoring the activities of wholly owned subsidiaries. The oversight function of corporate directors for Michigan corporations and corporations generally has been summarized in the American Bar Association's Corporate Directors Guidebook (fourth edition) page 14 as follows:

> A director should inquire into potential problems or issues when alerted by circumstances or events suggesting that board attention is appropriate; for example, inquiry is warranted when information provided on an important matter appears materially inaccurate or inadequate or there is reason to question the veracity of management. When directors uncover or receive from others information indicating that the corporation is or may be experiencing significant problems in a particular area of business, or may be engaging in unlawful conduct, they should make further inquiry and follow up until they are reasonably

satisfied that management is dealing with the situation appropriately. Even when there are no such "red flags," directors should periodically satisfy themselves that the corporation maintains programs that are appropriately designed to identify and manage business risks and reasonably effective to maintain compliance with laws and corporate policies and procedures.

In this case, MS&T appeared to the directors and officers to be profitable and growing in its business throughout the period in question. Its financial statements were reviewed by the outside auditors in the ordinary course of the preparation of the consolidated financial statements of the parent corporation. The directors and management were advised that the reporting practices of the subsidiary were consistent with practices of other companies in the industry. There is no indication in the materials that I reviewed that CMS officers or directors saw or should have seen "red flags" indicating accounting problems at MS&T in connection with zero margin trading.

CMS had in place a full complement of procedures and oversight functions to protect the corporation against improper practices and excessive risk. For example, there were numerous board committees, a risk management committee, and an internal audit function. The governance and oversight practices of CMS in 2000, 2001 and 2002 were consistent with the practices of other large well regarded public corporations. There does not appear to be any basis to conclude that CMS knew or obviously should have known that the financial reporting of MS&T was incorrect, or that the directors or management of CMS intended to mislead investors with financial reporting. There also is no evidence to indicate that zero margin trading was illegal. Accordingly, CMS had no special duty to investigate activities of MS&T beyond assuring itself that customary oversight procedures were being followed.

6

## VI. No Duty to Prevent CMS MS&T from Engaging in Zero Margin Transactions

MS&T engaged in zero margin transactions for the business purpose of enhancing its stature with its customers. I am advised that the zero margin transactions were not illegal. The reporting of the transactions on a gross basis had been approved by outside auditors. CMS was satisfied that the reporting of transactions on a gross basis had no impact on reported income of CMS. In light of the belief that the transactions were common in the industry, the lack of knowledge of the industry by CMS, the superior knowledge possessed by Arthur Andersen concerning the accounting for energy trading, the belief that reporting on a gross basis would improve the business of MS&T, and the approval of the reporting by outside auditors, the board and management of CMS had no duty to prevent MS&T from engaging in zero margin transactions in 2000 and the first two quarters of 2001 or to change the accounting from gross revenues and expenses to net margin accounting. Although there is some question in the facts as to the discontinuation of reporting of zero margin transactions on a gross basis in the latter part of 2001, there is no indication in the facts that this was the result of intentional misconduct or a gross disregard of duties.

## VII. No Recklessness in not Anticipating an SEC Investigation

The Dages report indicates that there was a drop in the market price of CMS securities when a preliminary investigation by the Securities and Exchange Commission was announced. Since the directors and officers of CMS did not believe that anything improper was occurring at MS&T with respect to the accounting for zero margin trading transactions, they had no reason to anticipate an SEC investigation of accounting practices at MS&T relating to a possible violation of federal securities law. There is no indication that CMS consciously intended to issue false and misleading financial statements.

The term "reckless" is not commonly used in connection with the analysis of director duties under Michigan corporate law. The term is used in determining liability under federal securities laws. The Sixth Circuit Court of Appeals has defined reckless conduct as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care", *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017 (6th Cir. 1979).

The foregoing discussion concluded that the CMS directors and officers acted in accordance with their statutory standard of care and customary business practices in connection with activities at MS&T. Consequently, it follows that CMS and its officers and directors were not "reckless" with regard to MS&T's accounting practices in reporting zero margin transactions and not anticipating an SEC investigation.

October 4, 2006                                            _____
                                                            Cyril Moscow

8

September 2006

## EXHIBIT 1

## CYRIL MOSCOW
## EXPERT TESTIMONY
### Since January 2002

1.  *Symorex v Iversen*
    Washtenaw County, Michigan Circuit Court (No. 01-1071-CK (2002)
    (director duties - deposition)

2.  *U.S. Bank Trust Assn. (River Park Square Project) vs. Prudential Securities, Inc.*
    U.S.D.C. E.D. Wash. (2003) (rebuttal report for defendant underwriter in securities action)

3.  *VSI Holdings, Inc. v SPX Corporation*
    U.S.D.C. E.D. Mich., S.D., No. 03-70225 (2004) (rebuttal report for defendant in acquisition agreement dispute)

EXHIBIT 2

**CYRIL MOSCOW**  September 2006
2290 First National Building
Detroit, Michigan 48226
(313) 465-7486 cmoscow@honigman.com

## Education

Wayne State University, A.B. 1954
The University of Michigan Law School, J.D. 1957

## Professional Experience

Practice: Admitted to the Michigan Bar in 1957. Trial attorney, United States Department of Justice, Civil Division,
1957-1960

Honigman Miller Schwartz and Cohn, Detroit, 1960 to date (Partner)

Trustee, H. B. Shaine & Co. SIPA liquidation (1987 to 1992)

Teaching: Adjunct Professor, Wayne State University Law School, Securities Regulation, 1973

Adjunct Professor, various corporate and securities classes and seminars, The University of Michigan Law School - 1973 to date (Visiting Professor Fall 1998)

Associations: State Bar of Michigan, Business Law Section:
- Section Chairman, 1979-1980; Chairman or Co-Chairman, Corporate Laws Committee
- Chairman, Business Corporation Act Revision Subcommittee, 1985 to date
American Bar Association, Section of Business Law
- State Regulation of Securities Committee: Chairman, Ad Hoc Subcommittee on Merit Regulation,
    1983-1988; Michigan Liaison
- Committee on Corporate Laws (1996-2003)
American Law Institute

## Publications

Articles:
(Partial List) *Aspects of Shareholders' Rights*, 18 Wayne Law Review 1003 (1972)

*The Independent Director,* 28 Business Lawyer 9 (1972)

*Michigan's Independent Director*, 46 Business Lawyer 57 (1990)

*Michigan or Delaware Incorporation*, 42 Wayne Law Review 1897 (1997)

*Oppression of Minority Shareholders*, Michigan Bar Journal, October 1998, p 1088

*The Representative Director Problem*, Insights, Vol. 16, No. 6 (June 2002)

*Arbitration Bylaws and Shareholder Class Actions,* Insights, Vol. 20, No. 4 (April 2006)

Books: Siegel, Schulman & Moscow, *Michigan Business Corporations*, Callaghan (1979 with 1987 supp)

Schulman, Moscow and Lesser, *Michigan Corporation Law & Practice*, Aspen Publishers (1990 with 2006 supp)

Moscow and Makens, *Michigan Securities Regulation*, Second Edition, ICLE (1994)

# EXHIBIT 3

Materials reviewed:

1. Conformed Third Amended Consolidated class action complaint.

2. Expert report of Kevin F. Dages.

3. Deposition of Kevin F. Dages September 15, 2006.

4. Expert report of Harris L. Devor.

5. Expert report of Michael J. Harris.

6. CMS Energy Special Investigative Committee Report dated October 25, 2002.

7. Deposition of William J. Parfet.

8. Deposition of David W. Joos.

9. Deposition of John Deutch.

10. Deposition of Preston Hopper.

11. Deposition of Alan Wright.

12. Articles of Incorporation, Bylaws, and Corporate Governance Principles of CMS Energy Corporation.

13. Minutes of Board of Directors meetings of CMS Energy Corporation.

14. Minutes of Board of Directors meeting of CMS Marketing Services and Trading Company.

15. Miscellaneous cases and legal reference materials for background.

DETROIT.2328098.4