# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

_____
|
IN RE CMS ENERGY SECURITIES | Civ. No. 02 CV 72004-DT
LITIGATION | (Consolidated)
_____|

# REBUTTAL REPORT OF DAVID TABAK

## I. INTRODUCTION AND SUMMARY OF FINDINGS

  This case involves a class composed of "[a]ll persons who purchased CMS common stock during the period of October 25, 2000 through and including May 17, 2002 and who were damaged thereby."[1]  On August 25, 2006, the non-accounting experts for plaintiffs and defendants exchanged expert reports.  Included among these were reports by Kevin Dages (the "Dages Report") for plaintiffs and my report (the "Tabak Report") for defendants.  On September 15, 2006 Mr. Dages and I gave depositions in this matter.

  Counsel for defendants in this matter has asked me to review and respond to the Dages Report.  My principal findings are as follows.

  1) The analyses in the Dages Report support the conclusion in the Tabak Report that the zero-margin transactions did not affect CMS's stock price.

  2) The alleged damages in the Dages Report are therefore based on other causes, including unforeseeable events such as the SEC investigation and ratings agency downgrades.

---

[1] Document No. 347 (Opinion and Order Granting in Part and Denying in Part Plaintiffs' Amended Motion for Class Certification (Document No. 233)), p. 15. In that Order and this report, "CMS" refers to CMS Energy Corporation.

3)      The decisions in the Dages Report not to parse or build up the alleged
        inflation in CMS's stock price are based on unsupported theory, errors
        in reading information, and on information regarding internal control
        weaknesses that the Dages Report does not find to have had an impact
        on CMS's stock price and that was ruled to be "not appropriately part of
        a securities litigation claim"[2] by the Court.

4)      The analysis in the Dages Report has a potential error rate (specifically,
        a 30% or greater likelihood of a false positive finding that CMS's stock
        price was affected by a component of the alleged fraud) much higher
        than the 5% error rate claimed in the Dages Report.  In addition, the
        Dages Report contains numerous mathematical errors that render its
        results suspect.

## II.    MATERIALS CONSIDERED

In addition to the materials listed as considered in the Tabak Report, I also
reviewed the Dages Report, the expert reports of Bradford Cornell and Michael Harris in
this matter, and materials listed as considered in those reports.  I have also reviewed rough
drafts of the deposition transcripts of Prof. Cornell and Mr. Dages.

## III.   THE ANALYSES IN THE DAGES REPORT SUPPORT THE CONCLUSION IN THE TABAK REPORT THAT ZERO-MARGIN TRADES DID NOT AFFECT CMS'S STOCK PRICE

In the Tabak Report, I concluded that it was unlikely that zero-margin trades
would have a significant effect on CMS's stock price based on finance theory, and that
empirical evidence shows that CMS's stock price was not affected by revenues, but was
affected by earnings.[3]

---

[2] Document No. 347 (Opinion and Order Granting in Part and Denying in Part Plaintiffs' Amended Motion for Class Certification (Document No. 233)), p. 9.
[3] Tabak Report, p. 2.  I note again that including zero-margin trades in reported financials would affect revenues but not earnings.

The Dages Report purports to examine the effects of information, such as the zero-margin trades, through a series of event studies.[4]   The Dages Report notes that for its analysis, "a t-stat of greater than an absolute value of 1.96 (corresponding to a 95% probability level) is considered to be statistically significant."[5]   The Dages Report notes that on March 29, 2002, CMS disclosed that it had accounted for revenues on several contracts on a gross rather than a net basis.[6]   The Dages Report further notes, "There was not a statistically significant 1-day or 3-day abnormal return on the stock surrounding this disclosure."[7]   This observation is consistent with the conclusion in the Tabak Report that accounting for offsetting energy trades on a gross basis versus a net basis had no effect on CMS's stock price.

The Dages Report further supports the Tabak Report's conclusion that CMS's stock price was not affected by the accounting treatment when it notes that after the market closed on May 8, 2002 and during the trading day on May 9, 2002, information came out that CMS had engaged in zero-margin trading with Dynegy and that the trades on November 15, 2001 were initiated by CMS-MST.[8]   CMS noted, however, that these November 2001 trades were not included in reported revenue or earnings, but the market quickly learned that such zero-margin trades were included in CMS' reported trading volume.[9]   Appendix D of the Dages Report shows that the t-statistic for CMS's stock price movement on May 9, when the news about the zero-margin trades came out, was -0.89.  The exhibit also shows that on May 10, when the news that CMS had initiated the November 2001 trades with Dynegy and that it had apparently included zero-margin trades in reported volume in earlier quarters was published, the t-statistic for CMS's stock

---

[4] Dages Report, p. 85.
[5] Dages Report, fn 247 on p. 86.
[6] Dages Report, p. 60.
[7] Dages Report, pp. 60-61.  We note that the t-statistic (or t-stat) on the first trading day after the announcement was -0.8363, less than half the 1.96 that the Dages Report notes is necessary for statistical significance (i.e., even if the abnormal (or market-adjusted) price movement were twice as large, it still would not be statistically significant.)
[8] Dages Report, pp. 61-62.
[9] See, for example, "Reliant, CMS apparently did high-volume of 'wash' trades," *Platt's*, May 10, 2002 at 1:17 pm. ("Analysis of the data shows a large amount of apparent 'wash trading' between Reliant and (continued)

price movement was -0.48. Neither of these t-statistics is statistically significant; both are less than half of the 1.96 in absolute value needed for statistical significance at the 5% level, the significance level used in the Dages Report.

Beyond showing that there was no statistically significant CMS stock price movement on three dates in which it was revealed, in aggregate, that CMS had engaged in zero-margin trades and had recorded at least some of those trades as revenues, the Dages Report further shows that the market may have been generally aware of such zero-margin trading. For example, on page 61, the Dages Report cites a May 9, 2002, *Dow Jones Business News* article stating, "Mr. Farr also said such deals were commonplace in the energy business." [10] Such market awareness of zero-margin trading is consistent with the lack of a statistically significant price movement on May 9 and 10, 2002.

Moreover, in his deposition, Mr. Dages made comments that echoed the analyses in the Tabak Report noting that revenues are unlikely to have an impact on the valuation of CMS once information about earnings was accounted for. For example, in discussing multiples analyses, Mr. Dages testified, "usually the closer you are to the cash flow line in terms of using a multiple, the more comfortable you might be with those results."[11] Because earnings are closer to cash flow than are revenues, the implication of Mr. Dages' testimony is that market participants should be more comfortable with valuations based on earnings (which were not affected by the recording of zero-margin transactions on a gross basis) rather than revenues. I agree. I also found similar results when analyzing what factors ultimately mattered for the market's valuation of CMS. Moreover, as zero-margin trades do not affect net cash flows, the ultimate goal of a valuation using the cash flow line is completely unaffected by such trades.

Despite his own empirical and theoretical evidence discussed above, Mr. Dages testified in deposition that he had observed "indirect" evidence that reported revenues had

---

CMS Marketing Services & Trading. In Q3 2001, for example, Reliant and CMS bought and sold more than 20-mil MWh to each other. The deals accounted for more than 70% of CMS's total sales.")
[10] "SEC Widens Dynegy Probe as Size, Timing of Trades Draw Scrutiny," *Dow Jones Business News*, May 9, 2002. Not quoted in the Dages Report is evidence that this was not just Mr. Farr's opinion, as the article notes, "Experts say such 'round-trip' trades happen regularly in the industry…"

an impact on CMS's stock price.[12]   However, the elements of this "indirect" evidence
either are unsupported by the actual analyses in the Dages Report or else are irrelevant to
this case.  For example, Mr. Dages claimed that "[t]o the extent that we determined that
there are price impacts attributable to those, and then those elements when traced went all
the way back to reported elements of revenue, then they are an element of the price
impact, and the path or the various paths to get there can range from a component that
says, for instance, one element going into the market's assessment of CMS's value was its
ability to sustain a dividend at the levels that it had been at."[13]   However, as just noted,
following the March 29, May 9, and pre-market May 10, 2002 disclosures, there were no
statistically significant market impacts.

Moreover, while revenues *without equivalent costs* can help sustain a dividend, an
equal increase in revenues and costs, the allegation in this case, should not lead the market
to think that a dividend could be sustained, and Mr. Dages has presented no evidence to
challenge that conclusion.  In fact, Mr. Dages' argument for this assertion is simply a
thought experiment in which he states, "The question of whether or not CMS would be
able to sustain a dividend is indirectly supported by the fact that if your dividend is
whatever it was, $200 million-odd a year, do you think a company with $6 billion in
revenue is better able to sustain that dividend if they have a very significant leverage
burden, or do you think that a company that is telling you they have $15 million [sic] in
revenue is much better positioned to sustain or continue that dividend, despite the leverage
burden that they face."[14]   This "indirect" support is actually a useless thought experiment
as it fails to include the economics related to the allegations in this case, specifically that
any inflated reported revenues were matched by equally inflated costs.[15]   Its use further

---

[11] Dages deposition rough draft 40:24-41:3.  (The rough draft is used for citations because the final draft
was not available as of the time this rebuttal report was being written.)

[12] Dages rough depo, beginning at 115:22.

[13] Dages rough depo, 116:20-117:6.

[14] Dages rough depo, 117:7-18.

[15] When asked if the ability to support a dividend is affected by revenue or earnings, Mr. Dages testified,
"I don't know that I would necessarily narrow it to one or either."  (Dages rough depo, 118:2-7.)  Mr.
Dages' comment flies in the face not just of scholarship, but blue-collar wisdom, to the point that it is
a common joke that an incompetent manager believes that one can lose money on each transaction and
make it up on volume.  (A Google search on "make it up on volume" and "joke" yields thousands of hits.)
(continued)

reveals the lack of support for Plaintiffs' position and Mr. Dages' inability to provide useful testimony in this matter.

### IV.    THE ALLEGED DAMAGES IN THE DAGES REPORT ARE BASED ON INFORMATION OTHER THAN ZERO-MARGIN TRADING

If the zero-margin trading did not cause any inflation or declines in CMS's stock price, the obvious question to ask is what is the cause of the inflation alleged in the Dages Report?  Here we examine the four disclosure events upon which the Dages Report bases its damages analysis as well as an additional disclosure event that the Dages Report did not include that would have lowered its estimate of alleged damages.

#### A.  May 13, 2002

The first of these events is labeled "May 13, 2002" on page 61 of the Dages Report.  After reviewing the disclosures about round-trip trading that could have affected CMS's stock price on May 9 and 10, the Dages Report notes that after the market closed on May 10, CMS announced that it has been asked to provide information to the U.S. Securities and Exchange Commission ("SEC") in connection with an informal inquiry into zero-margin trading.  The Dages Report also notes information such as a further *Platts* article on the apparent extensiveness of zero-margin trading,[16] earlier stock price movements of other energy companies in response to Reliant's canceling of its bond sale, and analyst commentary on these issues.  However, the main results of the *Platts* article had already appeared during the trading day on May 10 and the stock price movements of other energy companies had similarly already occurred, but CMS's stock price did not move by a statistically significant amount on May 10.  We must therefore conclude that the information in the May 9 and pre-market May 10 disclosures could not be the source of the new CMS stock price movement on May 13.  Thus, the only remaining potential

---

Even Mr. Dages admits that he brings "very little" expertise to this analysis, which he says could be done based on a "compilation of cash flow…" (Dages rough depo, 119:23.) This, of course, would give just the opposite of the result he desires because CMS's cash flows were not affected by the zero-margin transactions.

[16] The Dages Report does not mention the earlier *Platts* article at 1:17 pm on May 10, 2002 on the same subject with similar conclusions, thereby leaving the impression that this information could have first affected the market on May 13, 2002 instead of May 10.

explanation for the CMS stock price movement is the SEC investigation. Attributing the CMS stock price movement to the SEC investigation is consistent with analyst commentary cited by the Dages Report that cited the SEC investigation as the reason for their negative view of CMS's stock.[17]

Whether the disclosure of the SEC investigation could be a proper basis for damages is at least in part a legal issue and is thus beyond the scope of the expert reports on damages. I do note, however, that as a matter of economics, including the price decline on May 13 in an inflation estimate requires the identification of the information CMS was allegedly misrepresenting or improperly withholding from the market, as a proper analysis of inflation has the inflation beginning at the point when the misstatement was made or the omitted information was required to be disclosed. Here, prior to May 13, CMS had already disclosed that it had previously accounted for certain zero-margin transactions in revenues and costs, and had engaged in and initiated the November 2001 zero-margin transactions with Dynegy. The market already knew that the SEC had the ability to investigate CMS, especially given that it was disclosed that the SEC was investigating Dynegy over the exact trades at issue. Thus, the bases for a potential SEC investigation were disclosed, and, as far as I am aware, there is no allegation that CMS failed to disclose the actual SEC investigation in a timely fashion.[18] If CMS disclosed the SEC investigation in a timely fashion, and the market already knew that CMS had previously initiated the November 2001 trades that were the focus of the investigation, there is nothing more that CMS could have disclosed to the market that would be the basis for measuring inflation for this alleged disclosure. For May 13, 2002, Mr. Dages is thus measuring alleged damages for the realization of a risk that had already been made known

---

[17] See, for example, Hilliard Lyons ("We are downgrading our opinion on CMS Energy to Hold from Buy. We are changing our opinion as a result of the disclosure late May 10th that the company had received an informal letter of inquiry from the Securities and Exchange Commission regarding some of its energy trades.") and Morgan Stanley ("The uncertainty of what the SEC might rule and time to resolution will overhang CMS shares in our opinion. Further, the inquiry may limit access to the equity capital markets and damage the reputation of the company's trading & marketing business.")

[18] As of 2004, the SEC shortened the required disclosure time for new events to four business days. See, e.g., http://www.sec.gov/rules/final/33-8400.htm, ("The amendments also shorten the Form 8-K filing deadline for most items to four business days after the occurrence of an event triggering the disclosure requirements of the form.")

to the market, as opposed to the effects of information misrepresented or improperly withheld from the market.

**B.  May 15 –May 16, 2002**

The next alleged disclosure is described as "May 15 – 16, 2002" in the Dages Report.  The Dages Report notes that before the market opened on May 15, "CMS reported the preliminary results of an internal review of round trip trades at the MS&T unit."[19]  Following this announcement, CMS's stock price rose, rising relative to the market with a t-statistic of 1.20, not statistically significant, but actually larger in absolute magnitude than the t-statistic for the declines following the March 29, May 9, or pre-market May 10 alleged disclosure.  This price increase further supports my conclusion that the zero-margin, or round-trip, trades were not previously inflating CMS's stock price.

The Dages Report also provides excerpts from news stories reaching the market after trading on May 15 ended but before trading ended on May 16.  These excerpts include: republished news that CMS had engaged in the zero-margin trades with Reliant; news on how such trading was not illegal; news on the scope of the SEC inquiry; the resignation of Tamela W. Pallas, the president and CEO of CMS's trading unit; news that the Commodities Futures Trading Commission ("CFTC") was investigating CMS and other companies; and news that Moody's Investor Service ("Moody's") had downgraded CMS.

Any republication of old news would not move CMS's stock price if it traded in an efficient market.  The new information therefore included Ms. Pallas' resignation, the CFTC investigation, and the Moody's downgrade.  I am not aware of any allegation that CMS was aware of and improperly failed to disclose the CFTC investigation or the Moody's downgrade in a timely fashion.  If CMS did not fail to disclose relevant information, then it would be improper to include the portions of those disclosures in CMS's stock price decline on May 16, 2002 in damages.[20]  Whether any stock price

---

[19] Dages Report, p. 67.
[20] Removal of the portions of a price decline for which defendants could not be held liable is a long-established portion of a proper damages methodology.  See, for example, *In re Imperial Credit Industries, Inc. Securities Litigation,* 252 F. Supp. 2d 1005, 1014 (C.D. Cal 2003) *aff'd sub nom. Mortensen v.* (continued)

movement in response to Ms. Pallas' resignation should be included in damages is beyond the scope of my report.  However, as an economic matter, we note that her resignation did not disclose any new information and was clearly seen as a reaction to the already-disclosed information about CMS's zero-margin trading.  Given that there was new information that would have negative consequences available to the market on May 16 (i.e., the CFTC investigation and Moody's downgrade) and the information about the resignation was described as being "in the best interest of CMS Energy,"[21] it would be unreasonable to assign all, if even any, of the negative price movement to Ms. Pallas' resignation.  The Dages Report has not made any attempt to separate out the effects of the CFTC and Moody's information, which was apparently news even to CMS, from the effects of the news of Ms. Pallas' resignation, instead claiming the entire market-adjusted price movement as part of its inflation estimate.

### C.  June 11 – June 12, 2002

The next alleged disclosure described in the Dages report is labeled "June 11 – June 12, 2002."  The Dages Report notes that "on June 10, 2002, the Audit Committee of the Board of Directors of CMS Energy received a letter from AA [Arthur Andersen]," in which AA told CMS that it would not be able to issue an opinion on the proposed restated financial statements due to "the current situation at Andersen and the uncertain timing of

---

*Snavely, 145 Fed. Appx. 218 (9th Cir. 2005)* ("Because of the need 'to distinguish between the fraud-related and non-fraud related influences o[n] the stock's price behavior,' *In re Oracle Sec. Litig.,* 829 F.Supp. 1176, 1181 (N.D.Cal.1993), a number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar."); *In re Executive Telecard* 979 F.Supp 1021 (SDNY 1997) ("… a proper methodology for eliminating that portion of the price decline that is the result of forces unrelated to the wrong, should include elimination for both general market factors and company specific factors."); and *Howard Miller v. Thane International, et al.* (C.D. Cal 2005) Case No. SACV 03-1031-JVS(SGLx) ("…the Court finds that Preston could and should have factored out, at least to some degree, these effects in order to determine the effect of the alleged misrepresentation on Thane's share price.  The Court, therefore, finds Preston's failure to even attempt to control for or quantify such factors unacceptable under Imperial Credit.  See F. Supp 2d at 1016 (holding that an expert's opinion must take into account 'market events for which Defendants cannot be held responsible' and must 'eliminate that portion of the price decline of [the] stock which is unrelated to the alleged wrong.')  The failure to factor out the effect of known events is not merely one of degree to be brought out on cross-examination, but represents a fundamental flaw which invalidates Preston's damage calculation.")

[21] "Executive Resigns at CMS After Disclosure of $4.4 Billion in Bogus Trading Activity," *Associated Press Newswire*, May 16, 2002

when the special committee [investigating the zero-margin trading at CMS] will complete its work" and that AA's auditor reports related to CMS for the years ending December 31, 2000 and 2001 cannot be relied upon.[22]  CMS reported this information to the market the following morning, June 11, 2002.  Among the news events that day, Fitch Ratings ("Fitch") placed CMS on its "Rating Watch Negative" list.

Again, the Dages Report fails to construct a proper inflation ribbon by failing to indicate when CMS allegedly should have disclosed this information and adjusting the ribbon accordingly.  Logically, CMS could not disclose AA's or Fitch's actions before CMS itself knew about those actions.  Thus, an implicit assumption of the Dages Report is that CMS could have and should have disclosed to the market some information beyond what was already known to the market – i.e., that CMS had engaged in zero-margin transactions that led to an SEC and an CFTC investigation and the resignation of Ms. Pallas (with the associated headline "Executive Resigns at CMS After Disclosure of $4.4 Billion in Bogus Trading Activity"), that CMS was investigating the effects of those transactions, that AA was CMS's auditor and had difficulties of its own at the time, and that CMS had debt that was rated by Fitch that could be reviewed whenever Fitch chose to do so.  The Dages Report fails to identify what information CMS allegedly should have disclosed before the June 11 events or how and why that information should have been disclosed on October 25, 2000, when all of the alleged inflation in the Dages Report begins.  Instead, the only information that the Dages Report ties to alleged inflation and damages is new information (e.g., actions by AA or Fitch) that CMS could not have disclosed any sooner.[23]

After the market closed on June 11, Moody's downgraded CMS's credit rating.  Like the commencement of the SEC investigation, the downgrade was the realization of a

---

[22] Dages Report, pp. 74-75.

[23] Moreover, the Dages Report itself presents evidence that the market believed that AA's decision to stop working for CMS was based on its own troubles, not those of CMS.  See Dages Exhibit 4, quoting a June 13, 2002 CIBC World Markets Analyst report stating, "This premature termination was driven entirely by Andersen's situation, specifically 1) the lack of capacity to service CMS, especially in light of the closure of Andersen's Detroit office, and 2) Andersen's uncertain future."  If the market believed that the announcement revealed something to the market about AA and not about CMS, then the effects of that announcement should not be included in the calculation of the alleged inflation in CMS's stock price.

risk of which the market was fully informed earlier. In addition, the Dages Report notes that it was reported on June 12 that Consumers Energy's Palisades nuclear plant dropped from full power the day before to 51 percent power that day.[24] The change in the plant's daily operations was new information unrelated to the allegations in the Complaint. In fact, even the Dages Report notes that the effects of such information should not be included in damages when it states, *incorrectly*, on its page 89, "None of the announcements reported new information regarding CMS's operations which was unrelated to the Complaint allegations. For example, no new information is released regarding items which were the topic of class period or pre-class period disclosures: significant operational difficulties at the Palisades nuclear plant …" Based on this incorrect assertion, the Dages Report concludes that all of the price movements in its event windows were caused by information that does relate the allegations in the Complaint.

Yet, as discussed on page 80 of the Dages Report itself, there was an announcement about significant operational difficulties at the Palisades nuclear plant on June 12, 2002, one of the days for which the Dages Report measures CMS's stock price decline in calculating its alleged damages. Page 89 of the Dages Report is simply in error. As a result, the damages analysis in the Dages Report is overstated by including in the alleged stock price inflation the effects of news that even the Dages Report notes should not be included.

### D.  June 26 – June 27, 2002

The final alleged disclosure explicitly considered in the Dages Report is labeled "June 26 – 27, 2002." According to the Dages Report, on June 26, "CMS announced plans to restructure MS&T and revised its 2002 earnings outlook. …[CMS] announc[ed] the hiring of Winston & Strawn LLP to conduct a previously-announced investigation into round trip trades … [and] announced Rodger A. Kershner resigned as senior vice president, general counsel and corporate secretary."[25]

---

[24] Dages Report, p. 80.
[25] Dages Report, p. 82.

Again, the Dages Report never describes which portions of this information, if any, were allegedly improperly misrepresented or withheld from the market by CMS, and, if so, as of what points in time CMS was obligated to disclose that information.  Without establishing the relevant theory of liability, the inflation analysis in the Dages Report here is nothing more than a mechanical calculation of a price movement that may or may not be properly included in any alleged damages.

### E.  May 24, 2002

Appendix C-1 of the Dages Report notes that on May 24, 2002, CMS announced the resignation of William T. McCormick, CMS's chairman and chief executive officer, and the establishment of a special committee to investigate the zero-margin trading. According to Appendix D of the Dages Report, there was a *positive* movement in CMS's stock price on May 24, with an abnormal return of 3.65% and a t-statistic of 2.03, larger than the 1.96 used as a cut-off level in the Dages Report.[26]  Mr. Dages testified that the news on May 24, 2002 was related to the allegations in the Complaint.[27]  Thus, this would be exactly the type of event that should be included in the Dages Report's analysis of alleged damages.  Yet, unlike the four events associated with negative price movements (which the Dages Report treats as evidence of alleged damages) this event associated with a positive price movement (and thus evidence that plaintiffs recouped some of their losses, thereby mitigating their alleged damages) is not incorporated into the Dages Report's inflation calculation.  Even Mr. Dages testified, "As I sit here now I don't have a recollection of why we did not include it."  Given Mr. Dages' testimony that the event was related to the allegations in the Complaint, he should have included it in his damages analysis or else applied a consistent methodology that also excluded other events that were not direct disclosures of any alleged fraud.  The Dages Report instead included the events that raised the alleged damages but excluded the one that would have reduced the alleged damages.

---

[26] As discussed later, the proper cutoff level should be increased, meaning that one should not count this event or the May 15-16 event in damages.  However, if one has not increased the cutoff level, as the Dages Report has not done, then this event would be considered statistically significant.

[27] Dages rough depo, 230:4-19.

## V.   THE DECISIONS IN THE DAGES REPORT NOT TO PARSE OR BUILD UP THE ALLEGED INFLATION IN CMS'S STOCK PRICE ARE UNJUSTIFIED

On page 88, the Dages Report lists four issues on which Mr. Dages believes that the parties might differ.  I address these issues here.  I also address the internal contradiction in the decisions in the Dages Report not to parse or build up the alleged inflation in CMS's stock price.

### A.  Use of Announcements Beyond March 29, 2002

The first two issues that the Dages Report considers on page 88 are "[w]hether any abnormal return observed beyond the immediate reaction to CMS's filing of the 2001 Form 10-K on March 29, 2002 should be included [and w]hether the subsequent announcements I have analyzed and included should be attributed to the Complaint's allegations."

The Dages Report states that each later "announcement relays different additional partial information regarding either the CMS round trip trading activity or the existence and potential significance of the financial statement impact of MS&T's material internal control weaknesses, and therefore is reasonably included in an inflation estimate." However, as noted above, it is possible that all of that information was information that CMS could not have disclosed earlier.  In essence, the Dages Report is calculating alleged damages based on CMS's alleged failure to disclose information that it did not actually possess.  The "additional partial information" includes things like the SEC investigation of CMS with regard to the November 2001 trades, which the market did not anticipate even after CMS disclosed that it had initiated those trades with Reliant.  By not presenting a coherent theory of what CMS should have disclosed, the Dages Report conflates information that CMS allegedly could and should have disclosed earlier with "additional partial information" that could not have been disclosed earlier.

### B. Use of the Entirety, as Opposed to a Portion, of the Observed Abnormal Returns.

The third issue considered by the Dages Report on its page 88 is "[w]hether only a portion of the observed abnormal returns following certain announcements should be included in the inflation ribbon estimate."

First, even if one accepts that the later disclosures contained some information that CMS could have and should have disclosed earlier, the actual disclosures contained more than just that information. For example, even if CMS could somehow have disclosed more about the risk of an SEC investigation, it could not have disclosed the actual investigation until it was informed of the investigation. Thus, even if the Dages Report would like to argue that CMS should somehow have disclosed some additional information that would have led the market to recognize that there was, say, a 50 percent risk of an SEC investigation, the analysis in the Dages Report counts as inflation the effects of the ultimate disclosure that there was an SEC investigation, or essentially a 100 percent risk of such an investigation. As such, it necessarily overstates inflation and the alleged damages.

Second, as noted above, the Dages Report backs up its decision to include the entirety of the observed abnormal returns in its measure of alleged inflation by claiming that there were no disclosures of operating difficulties at the Palisades nuclear power plant in any of its corrective disclosure dates. Yet, as also noted above, the Dages Report itself shows that this statement is incorrect. Because the discussion in this section of the Dages Report misrepresents the findings of its earlier news analysis, this conclusion is invalid.

Third, one reason that the Dages Report gives in support of its decision to include the entirety of the observed abnormal returns in its measure of alleged inflation is that "[n]one of the announcements quantified the magnitude of the second CMS restatement (done in conjunction with the 2002 Form 10-K, filed in March 2003), required to correct for errors in CMS's 2000 and 2001 financial statements resulting from MS&T's material internal control weaknesses. Knowledge of these additional issues at MS&T would have affected market assessments of the achievability of CMS's growth plans, most specifically

the $120 million 2005 MS&T operating income target."[28]   In essence, the Dages Report argues that any *inflation* based on that information should be counted as a *damage* to shareholders without showing that that inflation *caused any loss*.   This is, in fact, the very argument rejected by the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627 ("*Dura*").[29]

As the Dages Report notes, "[n]one of the announcements" measuring the price declines included this information, and thus the information did not cause any loss on those announcements.   Instead, the information was disclosed with the filing of the 10-K in 2003, an event for which, interestingly, the Dages Report does not measure the statistical significance of CMS's stock price movement, as it did for all the other information it considered.[30]   The Dages Report argues that because this information

---

[28] The Dages Report (pp. 8-9) also argues that "[n]one of the announcements fully disclosed the extent of the material internal control weaknesses which AA identified at MS&T during the course of its 2001 audit, or the significant effort undertaken by CMS and AA to merely complete the 2001 audit."   Similar arguments apply to this statement as well.

[29] While I do not intend to opine on the legal meaning or interpretation of *Dura*, I do plan to discuss the economic interpretation of the analyses in the Dages Report so that the Court or the finder of fact can compare Mr. Dages' analyses to the relevant law.   I note here that Mr. Dages confirmed my understanding of his analysis when he testified that there was no difference between inflation and damages (before netting or aggregating for any individual), which has the implication that any inflation causes a loss and therefore qualifies as a damage, a position that I understand to be contrary to *Dura*. (Dages rough depo, 120:24-121:4 and 121:21-25.)

[30] While the Dages Report did not report the details of its market model, we were able to replicate it from the description given and reproduce the results of Dages Exhibit 12, which follows from the market model, to within a few pennies of difference in the results.   (The differences may be due to slightly different data series for the stock and/or index prices.)   When we applied the analysis to the form 10-K, we found that there was a statistically significant *positive* reaction on April 1, 2003 as well as a net positive reaction over the three-day period from March 31 through April 2, 2003.   (The news story related to the filing of the 10-K came out early on April 1, suggesting that the 10-K was not available to the market until April 1.   Even if one looked at March 31, 2003, CMS's abnormal stock price movement was positive, though not statistically significant, on that day.)   Thus, there is no basis for the Dages Report to state that the revelation of the internal weaknesses either caused any loss or inflated CMS's stock price. We also noted that there was a disclosure of weaknesses in CMS's accounting controls disclosed earlier in a November 14, 2002 earnings announcement.   Again, we found that CMS's stock price responded in a positive manner, though the movement was not statistically significant at the 5 percent level.

It should also be noted that while Mr. Dages testified that he believed the R-squared statistic for his regression "was 0.55 to 0.57" (Dages rough depo 45:22), such a result would be unusually large and someone experienced with the event study methodology and its application would generally investigate such a result to see if there were statistical problems with the work.   (Mr. Dages testified, "It's pretty clear that I'm not a statistician…" (Dages rough depo, 45:17-18.)   He further could not give an explanation of what an R-squared was other than "a relative ranking" without having to "read to you an answer out of a (continued)

"would have affected market assessments" about CMS, it would have affected the stock price – i.e., it would have caused a lower stock price, meaning that the stock price was inflated. Again, this is directly contrary to the Supreme Court's ruling in *Dura* about what is necessary for loss causation, and the Dages Report therefore bases its argument on damages by relying on information for which it has not shown, and the evidence is against, loss causation.

Finally, on March 24, 2006, the Court issued a ruling[31] stating,

> The court also agrees with defendants' assertion at oral argument, that later disclosures regarding internal management control problems are not appropriately part of a securities litigation claim. In supporting this argument defendants persuasively cite to <u>Santa Fe Industries, Inc. v. Green</u>, 430 U.S. 462, 477 (1977), which supports a finding that such allegations of corporate mismanagement do not come within the ambit of securities fraud.

Incredibly, Mr. Dages' reason for including those allegations in his damages conclusion, despite the Court's Opinion and Order was, "I don't know that that qualified as an order from the court."[32] While I offer no legal opinion, I do note that in all of my previous experiences, a damages expert reading a document from a court entitled "Order and Opinion" would consider that to qualify as an order from the court; at the very least, the expert should seek and disclose advice from counsel before calculating damages based on assumptions that are at odds with the plain reading of a document entitled Opinion and Order.[33]

---

book or look up the answer in a book…" (Dages rough depo, 46:3, 7-9.)) The actual R-squared was only 0.22 to 0.23 in our different replications of the Dages analysis.

[31] Document No. 347 (Opinion and Order Granting in Part and Denying in Part Plaintiffs' Amended Motion for Class Certification (Document No. 233)), p. 9.

[32] Dages rough depo, 213:20-214:3.

[33] I do agree with Mr. Dages' testimony that if the allegations about internal controls are not part of the remaining claims, that "would require [him] to go back to these abnormal returns and take another look at each one of those abnormal returns… [to] determine whether it's still reasonable to allocate a hundred percent of that abnormal return to the remaining elements of the claim or whether you should now say all right, internal controls are out of the claim or out of the case and therefore only 50 percent of this day's return is attributable to the remaining elements of the claim." (Dages Rough depo, 166:4-19.) Of course, the resulting damages could be cut by more or less than 50 percent; all we can say is that because Mr. Dages has not considered this information, the inflation analyses in his report are unreliable and likely if not certainly overstated.

### C. *Keeping the "Inflation Ribbon" Estimate Constant over the Class Period*

Finally, the Dages Report addresses the question of "[w]hether the resulting end of Class Period inflation ribbon estimate should be assumed to remain constant or assumed to vary across the Class Period."

In support of this, the Dages Report, on pages 89-90, argues that its "$9.61 per share inflation estimate is derived from CMS's corrective disclosures only through June 2002, and thus does not incorporate full revelation of MS&T's material internal control weaknesses which eventually led to the elimination of all of MS&T's reported operating income for 2000 and 2001." Here, the Dages Report is relying on an inflation that it did not show to be, and in fact was not, the cause of a statistically significant price movement (*i.e.,* no showing of materiality or loss causation).

In further support of this argument, the Dages Report argues on page 90 that "MS&T's overstatement of trading volume was relatively constant over the Class Period time window (78% for 2000 and 72% for 2001)." However, it is not the percentage overstatement of MS&T volume relative to actual MS&T volume that matters for CMS's stock price (even if, contrary to the evidence, that volume did affect CMS's stock price), but how MS&T volume relates to the size of CMS overall. This is true because CMS's stock price was based on the value of the entire company, and not just on the perceived value of MS&T. In fact, in just the next paragraph, the Dages Report notes that "MS&T did 'move up the ladder' in terms of its expected contribution to future CMS earnings growth." That is, early in the class period, MS&T was a smaller portion of CMS. Consequently, a "relatively constant" percentage inflation in MS&T volume would have represented a smaller portion of CMS at earlier points in time, and would have had a smaller effect on its stock price (assuming that there was any effect at all). In addition, the Dages Report's implicit argument here is not only that investors overvalued CMS's stock price because of allegedly inflated revenue figures, but that two years' worth of inflated revenues caused no more alleged inflation than one year's worth of inflated revenues; in other words, the Dages Report assumes that a longer history of allegedly inflated revenues

would not create a larger stock price effect than a single period of inflated revenues.  The Dages Report provides no theoretical or empirical support for such an argument.[34,35]

In addition, the Dages Report notes on its page 90 that "[w]hile MS&T did 'move up the ladder' in terms of its expected contribution to future CMS earnings growth, MS&T was always cited as a key contributor to CMS's expected earnings growth across the Class Period."  This argument simply does not support a claim that the alleged inflation should be constant.  Even if MS&T was a key contributor, it "move[d] up the ladder."  While one might argue whether, even accepting the Dages Report's measurement of inflation, that means that the inflation should start at, for example, 25% of his measured value and move up to 100% or start at, for example, 50% or 75% of his measured value and move up to 100%, it is illogical to argue that MS&T's moving "up the ladder" at CMS supports a constant level of inflation rather than a rising level of inflation that moves "up" as time passes.  Because the inflation is measured as of the end of the Class Period, the Dages Report has failed to move that inflation "down the ladder" as it estimated the alleged inflation for earlier points in time, *i.e.*, for those points earlier in the Class Period before MS&T had moved "up the ladder."  As a consequence, the Dages Report has overstated any inflation and any damages.

Finally, the decision to keep the alleged inflation "constant … across the Class Period"[36] reflects a complete misunderstanding of the analyses contemplated by the event studies in the Dages Report.  The Class Period ends on May 17, 2002.  One of the event studies measures a price decline of $2.31 in CMS's stock from May 10 through May 14,

---

[34] In contrast, there have been statements of support for a "build-up" method by which the amount of inflation rises with the amount of cumulative misrepresentations.  See, e.g., *In re California Micro Devices Securities Litigation* 965 F. Supp 1367 (NDCA) ("…the plan presented here is by far the most thorough, sophisticated and well substantiated such plan that the court has yet seen in a securities class action.") and *In re Cendant Corporation Securities Litigation* No. CIV.98-1664(WHW) (approving a plan with a build-up over objections from investors who did not get a claim as a result of the damages methodology).

[35] In deposition, Mr. Dages testified that he did not build up the inflation with the revenue overstatements "[b]ecause the relationship may not necessarily be linear." (Dages rough depo, 198:8-9.)  Even if one were to assume that the relationship is not necessarily linear, that is no reason for Mr. Dages' extreme view that there is no build-up at all and the very first revenue overstatement caused as much inflation in CMS's stock price as the combined effect of all of the revenue overstatements.

[36] Dages Report, p. 88.

2002.  The Dages Report then includes this $2.31 in its calculation of inflation that it claims existed over the entire class period.  That is, the Dages Report would have us believe that the $2.31 decline measured from May 10 through May 14 represents $2.31 in inflation in CMS's stock price *both before and after* that decline occurred.  If that decline does indeed represent inflation leaving the stock, then the inflation must necessarily be lower after that price decline.  Thus, the Dages Report is internally inconsistent in concluding both that the $2.31 decline represents a change in inflation and that inflation does not change when the stock price drops by that $2.31.

## VI.  THE DAGES REPORT HAS HIGH KNOWN AND POTENTIAL RATES OF ERROR

### A.  The Dages Report Uses Many Event Dates and Fails To Properly Adjust Its Tests of Statistical Significance

The Dages Report notes in its footnote 247 "a t-stat [or t-statistic] of greater than an absolute value of 1.96 (corresponding to a 95% probability level) is considered to be statistically significant."  By using a t-statistic cutoff of 1.96, one has only a 5 percent probability on any given test of mistakenly finding a result to exist when there is no true causal factor; i.e., there is only a five percent probability that any single event would be deemed statistically significant even if there were no underlying causal factor.  This is a standard level of statistical significance used in social sciences.  (See, e.g., *Reference Guide on Statistics*, published by the Federal Judicial Center, p. 124: "In practice, statistical analysts often use certain preset significance levels—typically .05 or .01.  The .05 level is the most common in social science, and an analyst who speaks of 'significant' results without specifying the threshold probably is using this figure.")

However, the Dages Report does not just examine one event date.  Instead, it explicitly examines at the very least the seven event dates of April 1, May 13, May 15, May 16, June 11, June 12, and June 26, all in 2002.[37]  Because these are independent events, the probability of the Dages Report finding at least one to be statistically significant even if none were actually material is not five percent or 0.05, but $1 - 0.95^7$, or

*30 percent.*  Put in Mr. Dages' terms, his "95% probability level" would then only be 70 percent.

In addition, the "May 13, 2002" section beginning on page 61 of the Dages Report discusses events that would have had an impact on CMS's stock price on May 9 and May 10 if the events were material.  Thus, the Dages Report implicitly discusses at least nine event dates, raising the probability that it would find at least one to be statistically significant even if none were actually material from five percent to $1 - 0.95^9$, or *37 percent.*

Finally, for its justification for including the full effects of these disclosures in its measure of inflation, the Dages Report relies on information only disclosed on March 31, 2003.[38]  Thus, there really are a total of at least ten event dates that should be analyzed, raising the probability that it would find at least one to be statistically significant even if none were actually material from five percent to $1 - 0.95^{10}$, or *40 percent.*

Examining many different event dates results in a statistical issue called "multiple comparisons."  The Federal Judicial Center's *Reference Guide on Statistics* describes it in its Glossary of Terms as follows:

> **multiple comparison.** Making several statistical tests on the same data set.  Multiple comparisons complicate the interpretation of a *p*-value [or measurement of the level of statistical significance]. For example, if 20 divisions of a company are examined, and one division is found to have a disparity "significant" at the 0.05 level, the result is not surprising; indeed, it should be expected under the null hypothesis.

While the Dages Report did not test 20 events or divisions, it did explicitly test seven and referred to at least ten that it could have tested.  Thus, its p-value, or the measure of statistical significance, is not the five percent it claims, but at least 30 percent. (Or, rather than the "95% probability level," the Dages Report has a "probability level" of at most 70 percent.)  Put differently, by testing different event dates and including any that have a t-statistic of 1.96 in the damages calculation, the potential error rate in the Dages

---

[37] See the Dages Report, p. 60 and Exhibit 12.

Report is at least six times the standard used in this field of work. Again, in the words of the *Reference Guide to Statistics,* "Repeated testing complicates the interpretation of significance levels. If enough comparisons are made, random error almost guarantees that some will yield 'significant' findings, even when there is no real effect. ... Even a single researcher may search for so many different relationships that a few will achieve statistical significance by mere happenstance."[39]

Through its examination of multiple event dates without properly adjusting its statistical calculations, the potential error rate in the Dages Report is not the stated five percent, but anywhere from thirty to forty percent.[40]

### B. The Dages Report Has Numerous Calculation Errors

All of the statistical calculations that lead to the inflation series in the Dages Report are either not provided or else contained in its Exhibit 12.

First, nowhere does the Dages Report present the results of its market model, or the regression analysis (i.e., the statistical analysis) to determine the relationship between movements in CMS's stock price and the price of the S&P 500 Electric Utility Index, despite its claim that its Appendix D provides the "Detail of Market Model Regression Results."

Second, its figures in Dages Exhibit 12, the table showing what are normally very common and standard event study calculations, are riddled with errors. Among these are the following[41]:

§   The "CMS Cumulative Return" from 5/9/02 through 5/14/02 is reported as -12.87% while the correct figure is -13.64%.

§   The CMS Closing Stock Price on 5/9/02 of $19.72 multiplied by the "Cumulative Abnormal Return" from 5/9/02 through 5/14/02 of -10.89% yields a Cumulative Abnormal Return in Dollars of -$2.15, while the

---

[38] Dages Report, pp. 88-89.
[39] *Reference Guide to Statistics*, pp. 127 - 128.
[40] As an example of an academic article making an adjustment for multiple comparisons in the course of performing more than one event study, see Michael J. Cooper, Orlin Dimitrov, and P. Raghavendra Rau, "A Rose.com by Any Other Name," *Journal of Finance*, December 2001.
[41] The corrected results are based on the data in Dages Exhibit 12. Because the Dages Report failed to provide the underlying regression results, some of these figures may be slightly off due to the rounding of figures in Dages Exhibit 12.

Dages Report presents a Cumulative Abnormal Return in Dollars of -$2.31 for that period.[42]

§   The "CMS Cumulative Return" from 5/14/02 through 5/17/02 is reported as -3.82% while the correct figure is -4.61%.

§   The CMS Closing Stock Price on 5/14/02 of $17.03 multiplied by the "Cumulative Abnormal Return" from 5/14/02 through 5/17/02 of -6.35% yields a Cumulative Abnormal Return in Dollars of -$1.08, while the Dages Report presents a Cumulative Abnormal Return in Dollars of -$1.12 for that period.

§   The "CMS Cumulative Return" from 6/7/02 through 6/13/02 is reported as -23.58% while the correct figure is -23.31%.

§   The CMS Closing Stock Price on 6/7/02 of $17.17 multiplied by the "Cumulative Abnormal Return" from 6/7/02 through 6/13/02 of -24.71% yields a Cumulative Abnormal Return in Dollars of -$4.24, while the Dages Report presents a Cumulative Abnormal Return in Dollars of -$4.01 for that period.

§   The "CMS Cumulative Return" from 6/24/02 through 6/28/02 is reported as -16.71% while the correct figure is -16.50%.

§   The CMS Closing Stock Price on 6/24/02 of $13.15 multiplied by the "Cumulative Abnormal Return" from 6/24/02 through 6/28/02 of -16.99% yields a Cumulative Abnormal Return in Dollars of -$2.23, while the Dages Report presents a Cumulative Abnormal Return in Dollars of -$2.17 for that period.

In addition, there are similar errors in all of the cumulative returns even within the time periods listed above (e.g., in addition to the errors for the period from 5/9 through 5/14, the cumulative figures from 5/9 through 5/13, the intermediate trading day, also are incorrect).

### C.  The Dages Report Groups Event Dates In a Manner that Increases its Likelihood of Finding Statistical Significance

In addition to examining the statistical significance of individual events, the Dages Report groups events into three- or four-day windows.  Because it considers both May 13,

---

[42] When this error was pointed out to Mr. Dages in his deposition, he testified that it was likely due to rounding.  (Dages rough depo, 224:8-21.)  However, an expert familiar with event study methodology or statistics would have been able to see that even if the $19.72 were rounded up to $20 and the -10.89% were rounded up in absolute value to -11%, the result would only be an abnormal return of -$2.20, still not enough to reach the -$2.31 reported in the table.

2002 and May 15, 2002 to be disclosure dates, the Dages Report had a choice as to whether to include the intervening trading day, May 14, in either the first or second window. (Including May 14 in both windows would result in double-counting that date.)

The Dages Report included May 14 in the window corresponding to the May 13 event without providing any reasoning for that choice. Interestingly, that choice results in both the May 13 and the May 15 windows showing statistically significant returns. However, had the Dages Report instead included May 14 in the "May 15 & May 16" window, the cumulative abnormal return for that window would have been under one percent, which would not have been statistically significant.

Given two potential statistical choices, it is not a valid methodology to select one without explanation, particularly when that choice affects the number of events deemed to be statistically significant. We go back once again to the *Reference Guide on Statistics,* "Even a single researcher may search for so many different relationships that a few will achieve statistical significance by mere happenstance."[43] Here, there were two possible relationships (in this case, ways of grouping dates into events), and the Dages Report only presented the one that made all the events appear to be statistically significant. Because of this biased, or at the very least unexplained, methodology, the statistical results in the Dages Report are necessarily invalid.

In a similar fashion, Mr. Dages did not know or could not explain why he extended one event window in his Exhibit 12 for an additional day when there was a statistically significant abnormal return but did not extend another window when the additional day had a statistically significant abnormal return. (Dages rough depo, 228:2-23.) Because statistical results depend on a pre-established methodology, Mr. Dages' inability to provide a methodology that explains his calculations renders the statistical analyses he has done invalid.

Mr. Dages testified, "It's pretty clear that I'm not a statistician…"[44] However, it takes a statistician to understand that certain procedural choices affect the validity and

---

[43] *Reference Guide to Statistics*, p. 128.
[44] Dages rough depo, 45:17-18.

interpretation of the statistical results of an analysis.  In numerous instances, the Dages Report has used methodologies and arbitrary (and unexplained) choices that render his statistical conclusions invalid such that they vastly overstate the significance of its actual results.

## VII.   THE DAGES REPORT CONTAINS A LARGE DISCUSSION IRRELEVANT TO ITS ANALYSES

Beginning on page 5 and running through page 60, the Dages Report has an extended discussion about public and non-public information allegedly related to the allegations in this case.  It is clear that none of this information goes into the event study or calculation of price effects of various alleged disclosures, as those are based solely on the price movements of CMS's stock and an index.  It also appears that none of this information affects any other opinions in the Dages Report, as none of this information is used to increase, decrease, or otherwise modify the results of the simple event studies based solely on prices.  Even when the Dages Report claims that this information was used as a basis for taking the full effects of those simple event studies and holding the inflation ribbon constant, it does so by actually ignoring this material (see the discussion of the Palisades plant above), referring to later disclosures without actually measuring their statistical significance (see the discussion of the March 31, 2003 10-K above), arguing that inflation in the absence of loss causation should be included in damages, or reaching the bizarre conclusion that something that "move[d] up the ladder" was at a constant level rather than starting low and moving up.

As such, I do not see how this information was actually used to help reach Mr. Dages' opinions or how it is necessary for his report.  In fact, Mr. Dages never addresses information in that section that is actually contrary to his conclusions, such as his quoting of Mr. Farr (and his failure to quote a statement about other experts) that zero-margin trading was common in the energy industry.  If experts knew that such trading was common, then Mr. Dages' conclusion that the market was surprised by the disclosure of such trades becomes untenable.  Of course, some background information is always helpful and not every sentence in an expert report needs to directly feed into the conclusion, but 55 pages of material that do not affect the conclusion is unusual.

Particularly noteworthy are the comments to which I do not respond that seem to be more of a presentation of case on liability rather than damages.[45] Among this information is the following: that "Reliant began engaging in round trip trades of electric and gas under Ms. Pallas' direction,"[46] a conclusion or speculation that an "October 27, 2000 memo … suggests that Mr. Hopper made an independent investigation into whether the MS&T round trip trade met the criteria for a sale,"[47] a statement that, "[d]espite these instructions, MS&T recorded and reported the round trip transactions on a gross-basis in its third quarter 2001 financial statements,"[48] and a statement that "CMS internal Q4 2001 forecasts, however, present a different perspective on MS&T growth through 2004" than external marketing materials did.[49] If this material were being used for a damages analysis, then one would expect that the inflation, measured by the disclosures at (and in this case by the Dages Report even after) the end of the Class Period would be reduced earlier in the Class Period, for example before the publication of the marketing materials that allegedly showed a different perspective than the internal Q4 2001 forecasts.[50]

Because statements of this sort appear to address liability rather than damages, I do not respond to them at present, but reserve the right to do so should they be tied to a damages analysis.[51]

---

[45] Information about liability has a place in a securities fraud damages report if the inflation series is adjusted to correspond to liability for different information allegedly misrepresented or improperly withheld from the market. However, the Dages Report never changes its inflation series due to any of the information it presents related to events before May 2002.

[46] Dages Report, p. 5.

[47] Dages Report, p. 7.

[48] Dages Report, p. 15.

[49] Dages Report, p. 51.

[50] Generally, providing additional false information to the market would increase the amount of inflation, meaning that the inflation would be less before a misrepresentation was made. Alternatively, the Dages Report may be implicitly concluding that these statements did not add any inflation to CMS's stock price and therefore did not cause any additional losses.

[51] In his deposition, Mr. Dages testified, "I think the evaluation of whether or not the approach you've taken, the expert, an expert has taken, is reasonable, is based on how well that analysis ties to or is built upon the facts of the case. When I look across the expert reports that are in this matter as they stand right now, which I realize may be very different when the defendants' rebuttal reports come in, but right now on one side there is a report with somewhere in the neighborhood of 250-odd footnotes to the record and extensive analysis of what was communicated by management to the marketplace, and on the other side there's two reports with, forgive me, I've only skimmed them, but I think less than 20 cites and little or no link to the record." (Dages rough depo, 73:13-74:6). While the Dages Report may have many more cites (continued)

## VIII. CONCLUSION

The Dages Report has a number of failures that render its conclusions unreliable. Perhaps most important, it is not clear what the basis is for attributing the price movements that the Dages Report measures to the allegations in this case.  As discussed above, some of those price movements were due to events that CMS could not have disclosed earlier and others included the effects of information unrelated to the allegations in this case or were due to allegations that have been excluded by the Court. Consequently, the Dages Report simply considers all statistically significant negative price movements shortly after May 9, 2002, while at the same time it ignores a statistically significant positive price movement that Mr. Dages said was related to the alleged fraud.

Beyond this, the Dages Report provides no support for the claim that the zero-margin trading affected CMS's stock price, other than that there were price declines when *other information* was disclosed.  Notably, the Dages Report itself finds that there was no statistically significant decline when the zero-margin trading by CMS was disclosed to the market.

The Dages Report also bases its damages analysis on a view that all inflation in CMS's stock price should be included in damages, even if there is no showing that that inflation caused any decline in the stock price (and, in fact, if the evidence is that the stock price did not decline when the information was revealed), or if the inflation was based on material that the Court has ruled is not properly part of a securities fraud claim.  The Dages Report further assumes that the alleged inflation in the stock price is constant over the entire Class Period, meaning, implausibly, that neither the amount of zero-margin trading nor the alleged disclosures during the Class Period had any effect on the amount of inflation.

---

to the record, including aspects that appear to deal with liability, there is no reasonable basis for his implicit claim that his "analysis ties to or is built upon the facts of the case" due to these 250-odd footnotes.  Again, the calculation of inflation in the Dages Report is simply based on a limited number of dates and Mr. Dages concludes that the alleged inflation never changed over the entire Class Period, despite various changes in "what was communicated by management to the marketplace."  The only way this would be logical is if Mr. Dages is also concluding that none of those communications after the start of the Class Period either raised or lowered the level of inflation, despite the varying levels of zero-margin trades and other information in those statements.

Finally, the Dages Report has a high known or potential rate of error of at least 30 percent, as opposed to the 5 percent it claims. In addition, the analyses in the Dages Report are rife with calculation errors while the statistical analysis is often done in an arbitrary fashion, rendering the conclusions unreliable.

Date: 10/4/06

David Tabak