**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

IN RE:

                                Civil No. 02-CV-72004-DT

                                HON. GEORGE CARAM STEEH

CMS ENERGY SECURITIES
LITIGATION

_____/

**CMS ENERGY CORPORATION'S BRIEF IN OPPOSITION TO PLAINTIFFS'**
**MOTION TO STRIKE AND TO PRECLUDE DEFENDANTS FROM RELYING ON**
**REBUTTAL REPORTS OF CYRIL MOSCOW AND DAVID TABAK**

McDERMOTT WILL & EMERY LLP
Eric Landau (Cal. Bar No. 138849)
Steven J. Aaronoff (Cal. Bar No. 158921)
Shawn Harpen (Cal. Bar No. 198948)
18191 Von Karman Avenue, Suite 500
Irvine, CA 92612
(949) 851-0633

MILLER, CANFIELD, PADDOCK &
STONE, P.L.C.
Thomas R. Cox (State Bar No. P42036)
Todd A. Holleman (State Bar No. P57699)
150 West Jefferson, Suite 2500
Detroit, MI 48226
(313) 963-6420

Attorneys for Defendant CMS Energy Corporation

October 27, 2006

# I.  INTRODUCTION

Defendant CMS Energy Corporation ("CMS" or the "Company") respectfully submits this memorandum of points and authorities and the accompanying Declaration of Steven J. Aaronoff in opposition to plaintiffs' Motion to Strike and to Preclude Defendants From Relying on Rebuttal Reports of Cyril Moscow and David Tabak (the "Motion to Strike").

In an opening brief short on analysis yet long on conclusion, plaintiffs advance unfounded arguments against certain of the expert reports submitted by CMS.  First, with respect to CMS's rebuttal expert on corporate governance issues, Cyril Moscow, plaintiffs contend that the opinions expressed in Mr. Moscow's rebuttal report dated October 4, 2006 (the "Moscow Rebuttal") do not address any of the issues discussed in the opening report submitted by plaintiffs' expert Kevin Dages dated August 16, 2006 (the "Dages Report")[1], and that the Moscow Rebuttal[2] should therefore be considered an untimely affirmative expert report.

Second, with respect to the rebuttal expert report submitted on behalf of CMS by Dr. David Tabak dated October 4, 2006 (the "Tabak Rebuttal")[3] and also with respect to the Moscow Rebuttal, plaintiffs argue that Dr. Tabak and Mr. Moscow have reached impermissible legal conclusions that are beyond the proper scope of expert testimony.

For the reasons discussed below, both of plaintiffs' arguments are without merit.  First, as demonstrated by both the text of the Dages Report itself and statements by Mr. Dages during his initial deposition in this action, Mr. Dages has reached conclusions in this matter concerning the manner in which the directors and officers of CMS supervised the Company's financial reporting, including in particular the Company's interaction with its auditors at Arthur Andersen

---

[1] See Dages Report, Ex. "A" to the accompanying Declaration of Steven J. Aaronoff ("Aaronoff Decl.").
[2] See Moscow Rebuttal, Ex. "C" to Aaronoff Decl.
[3] See Tabak Rebuttal, Ex. "E" to Aaronoff Decl.

LLP ("AA") regarding the accounting treatment for zero margin trading activity that was carried out by the Company's MS&T subsidiary.  Mr. Dages also expressed his views concerning the foreseeability to CMS directors and officers of an investigation by the U.S. Securities and Exchange Commission ("SEC") in connection with the accounting treatment for zero margin trading activity.  Mr. Dages also has reached conclusions concerning the culpability of the CMS directors and officers for internal control weaknesses at the MS&T subsidiary level  -- notwithstanding the fact that the Court expressly removed such allegations from the scope of the securities fraud claims in this lawsuit, by the Court's ruling on class certification dated March 24, 2006.  Given the expansive scope of Mr. Dages' actual opinions in this matter, well beyond the anticipated scope for an expert designated to discuss securities damages issues, and the likelihood that Mr. Dages' testimony at trial (if permitted) would be even broader in scope, the Moscow Rebuttal appropriately discusses corporate governance issues, the custom and practice for Michigan directors and officers with respect to reliance on the work of auditors, and the foreseeability of government investigations with respect to such matters.

Second, plaintiffs are simply flat wrong in contending that the Moscow Rebuttal and the Tabak Rebuttal present inadmissible legal opinions, or somehow should be stricken because they refer to court decisions in several instances.  Federal caselaw ignored by plaintiffs demonstrates that it is not unusual for expert witnesses (who sometimes, like Mr. Moscow, are accomplished practicing attorneys) to deliver admissible, helpful opinions that are couched in legal terms; such opinions do not automatically usurp the federal district judge's role in instructing the jury as to the law.  Furthermore, plaintiffs' counsel know or reasonably should know that expert witnesses in federal securities cases around the country cite to federal case precedents in support of analyses involving stock market behavior and potential damages models  --  but again, this does

not usurp the court's control of deciding the applicable law, and does not turn an expert's

opinion on financial and statistical questions into a purely legal opinion.

## II. THE MOSCOW REBUTTAL IS ENTIRELY PROPER AND UNOBJECTIONABLE

    A.    The Dages Report and His Deposition Testimony Invade Corporate Governance

          Territory

On August 25, 2006, pursuant to the Court's scheduling order in this action, plaintiffs'

counsel served the Dages Report.  The Dages Report states that Mr. Dages' only assignments

from counsel were (a) "to develop reasonable estimates of the amount of per share inflation

present in the CMS stock price during the period October 25, 2000 through and including May

17, 2002 ("Class Period") as a result of the Complaint's allegations[;]" and (b) to "examine the

impact of additional disclosures related to the CMS round trip trading and other allegations in the

Complaint that occurred within the 45 days subsequent to the end of the Class Period."  (Dages

Report, p. 3, Section 2, ¶ 1.)  Similarly, in the "Summary of Opinions" section, the only opinion

expressly described by Mr. Dages is, "I considered the potential for my estimate of CMS's stock

price inflation per share to have varied across the Class Period and concluded, based on the

analyses documented in this report, that the best estimate of the inflation of CMS's stock price is

a constant $9.61 per share across the entire Class Period."  (Dages Report, p. 4, Section 4, ¶ 2.)

However, despite the circumscribed scope of opinion discussed in the opening pages of

the Dages Report, Mr. Dages' discussion of the case and his selective review of pieces of the

discovery record runs far afield from an analysis of the movement of CMS's stock price in

connection with CMS's periodic financial disclosures during the Class Period.  Mr. Dages

assumes as true plaintiffs' allegation that CMS used "improper accounting practices in violation

of GAAP and SEC reporting requirements to falsely inflate CMS's balance sheet and to falsely

report revenues in the interim quarters and fiscal years" during the Class Period.  (Dages Report, p. 1, citing Third Amended Consolidated Class Action Complaint ("Complaint"), ¶ 392.) Similarly, Mr. Dages assumes as true (among other things) plaintiffs' allegation that CMS "failed to implement and maintain an adequate internal accounting control system, or knowingly or recklessly tolerated the failure to use existing internal controls in a manner that would ensure compliance with GAAP."  (Dages Report, p. 2, fifth bulletpoint, citing Complaint, ¶ 416.)

Thereafter, in the body of his report, Mr. Dages, subjectively summarizing snippets from certain exhibits and deposition testimony from the fact discovery phase, goes far beyond merely assuming the truth of plaintiffs' allegations and instead attempts to buttress plaintiffs' conclusions on these accounting and financial reporting issues.  First, Mr. Dages alludes to certain discussions between CMS's auditors, Arthur Andersen LLP ("AA"), and the Chief Accounting Officer of CMS, Preston Hopper, and CMS's Audit Committee Chairman, William U. Parfet, in connection with AA's third quarter 2000 review.[4]  (See Dages Report, p. 7.)  Mr. Dages concludes that documentation from AA's files on the third quarter 2000 review "suggests that Mr. Hopper made an independent investigation into whether the MS&T round trip trade met the criteria for a sale[.]"  (Dages Report, p. 7.)  Predictably, Mr. Dages offers no discussion of what AA communicated to CMS in connection with the third quarter 2000 review regarding the accounting treatment for the round-trip trading activity, or of the other relevant facts and circumstances surrounding such accounting issues.

Subsequently, at page 11 of the Dages Report, Mr. Dages again misinterprets "sound bytes" from the discovery/deposition record, this time with respect to events on or about April

---

[4] It is not subject to dispute that the third quarter of 2000 was the first financial period for CMS in which the round-trip energy trades implemented in 2000 by the MS&T subsidiary had any impact on the reported revenues and expenses of CMS.

27, 2001, concerning AA's review of CMS results for the first quarter 2001, including in particular a conference call on April 27th between AA, Mr. Hopper and Mr. Parfet.  Here, without any full or fair discussion of the record, Mr. Dages attempts to suggest that AA warned CMS that the round-trip trades lacked economic substance and should not have been recorded as revenue, but that CMS chose to ignore such advice.

Next, on page 13 of the Dages Report, again briefly and selectively citing to portions of the discovery/deposition record, Mr. Dages concludes, "AA opined that revenue and expenses on these trades should be recorded on a net basis thus eliminating any impact from the round trip trades[,]" and that "[t]his conclusion was memorialized in an AA memo dated May 14, 2002 [sic], which was provided to MS&T prior to July 24, 2001."  (Dages Report, p. 13, ¶ 2.)

Further on in the Dages Report, at page 19, Mr. Dages launches into a similarly legally conclusory and factually incomplete discussion of certain internal control issues at the MS&T subsidiary in connection with AA's completion in March 2002 of an audit of MS&T for fiscal year 2001, and implicitly suggests that CMS management had ignored or concealed such issues. However, the Dages Report fails to note that, pursuant to the Court's order regarding class certification in this action, dated March 24, 2006, the Court specifically ruled that internal control issues were not properly part of the action.  Mr. Dages then provided his own legal opinion that he was not bound by the Court's order when he testified at deposition that, "I don't know that that qualified as an order from the court."  (Dages Transcript, 213:20 – 214:3.)[5]  The Court's ruling stated in pertinent part:

> The court also agrees with defendants' assertion at oral argument, that later
>
> disclosures regarding internal management control problems are not appropriately part

---

[5] See Dages Transcript dated September 15, 2006, Ex. "B" to Aaronoff Decl.

of a securities litigation claim.  In supporting this argument defendants persuasively

cite to <u>Santa Fe Industries, Inc. v. Green</u>, 430 U.S. 462, 477 (1977), which supports a

finding that such allegations of corporate mismanagement do not come within the ambit

of securities fraud.

(Opinion and Order Granting in Part and Denying in Part Plaintiffs' Amended Motion for Class

Certification, p. 9; Ex. "D" to Aaronoff Decl.)

Subsequent to plaintiffs' submission of the Dages Report, on September 15, 2006, Mr.

Dages' responses to direct examination in deposition only reinforced that the purported bases

and underlying assumptions behind the Dages Report involve conclusions by Mr. Dages

regarding corporate financial disclosure issues and accounting issues, especially the manner in

which CMS's directors and officers dealt with their auditors at AA concerning the accounting

treatment for round-trip trading at the parent level, and also concerning internal controls at

MS&T.

First, Mr. Dages testified that, in his opinion:

". . . [T]he financial statements are the statements of the company and the management
team.  So for instance just as a pure example, let's say I found an error in the financial
statements when I'm doing the audit, I can't just pull you aside and walk in and say hey, I
found a problem with the inventory so guess what, I booked an adjustment for you, so
you're fine now, I made the change to your financials.  The financials are yours, and so if
you were the management team or the owner, my job was to bring the issue to you…and
then based on how much you booked or did not book, at the end of the engagement
someone above me at the audit firm would decide whether or not they're still willing
to pass on it and issue a clean opinion on those financials."

(Dages Transcript, 104:1 – 105:25.)

Second, Mr. Dages also testified:

"Q.    Understanding that the decision whether to follow your advice or
not follow your advice was ultimately management's decision, in your position
when you were giving the advice, would you expect that management could rely

on the advice you were giving?

\* \* \*

    A.    Yes.  Said another way, I attempted to only give advice that would be useful and/or advice that I would hope the management team would, you know, consider and rely on."

(Dages Transcript, 106:3-19.)

    Third, Mr. Dages opined on the foreseeability to CMS management of an investigation

by the Securities and Exchange Commission in connection with round-trip trading:

    "Q.    As you sit here today do you have an opinion as to whether it was foreseeable on May 9th and everything that had been disclosed up to that point, whether there would be an SEC investigation into CMS?
    \* \* \*
    A.    Well, you know, perhaps there is a subtlety to your question regarding foreseeability that I'm not catching, but as someone begins to reveal potential wrongdoing in their reporting or their activity, then I think coincident with that there is a rise in probability that there may be an investigative action by regulatory agencies, whether it's the SEC or the CFTC or the FERC or whoever.  So my answers to you are based on as news comes out that indicates the potential for wrongdoing or misreporting, then the likelihood of a potential investigation, that probability should rise."

(Dages Transcript, 146:18 – 147:13.)

    Fourth, Mr. Dages opined that the internal control weaknesses at MS&T should have

been disclosed by CMS at some unspecified point in time, and that CMS's failure to make such

disclosure made other disclosures by CMS a "falsehood."  (Dages Transcript, 182:8 – 183:19.)

Later, questioned again on a similar point, Mr. Dages stated:

    "So the expertise that I apply is expertise in the accounting sense to be able to interpret and put in perspective for a judge or jury the significance of these reports and how dramatic the discrepancy is between having your auditors tell you you have material internal control weaknesses and having the head of the business tell the marketplace that you have exemplary risk management and internal control features and that you ought to be willing as the marketplace to accept a forecast that's going to call for $120 million of operating income two to three years hence."

(Dages Transcript, 202:16 – 203:4.)

Fifth, with respect to restatements by CMS in March of 2003 that sharply reduced reported operating income for the MS&T subsidiary, Mr. Dages opined:

> "Q.      So you've concluded that the ultimate restatement of $85 million of operating income to $1 million of operating income was the result of an internal control weakness?
> A.      No, I don't know that I've said that to you.
> Q.      Well, have you made that conclusion or reached that conclusion?
> A.      I've seen no other explanation from the company either in its documents or elsewhere that points to another cause other than the internal control weaknesses at MS&T that would have led to that restatement.

(Dages Transcript, 204:2-14.)  However, it should be noted that, earlier in his deposition testimony that day, Mr. Dages had stated:

> "Q.      Your testimony would be that the March 2003 adjustment to MS&T operating income is not the result of round-trip trades on a gross rather than a net basis in 2000 and 2001?
> A.      That's my understanding, based on my read of the restatement documents."

(Dages Transcript, 100:22 – 101:5.)

In sum, based upon the foregoing statements in the Dages Report and in his deposition testimony explaining the Dages Report, Mr. Dages made clear that his conclusions are based in no small part upon his opinions regarding CMS's preparation of financial statements, interaction with its auditors regarding accounting treatment for round-trip trading, internal control issues at MS&T, and the foreseeability of government probes arising from such issues.

This "frolic and detour" by plaintiffs' designated securities damages expert frames plaintiffs' theory similarly to that in Chill v. General Electric Co., 101 F. 3d 263 (2d Cir. 1996) and other cases where class plaintiffs have attempted unsuccessfully to affix Section 10(b) liability to a parent and its directors and officers for internal control problems at a subsidiary. Chill involved allegations against General Electric ("GE") arising out of a fraud that occurred at one of GE's subsidiaries, the financial firm of Kidder Peabody.  A Kidder Peabody employee

allegedly conducted a scheme in which he generated false profits by entering non-existent trades into Kidder's computer system in order to inflate his productivity and thus his year-end bonus. The trades were designed to be hidden from Kidder's management and auditors, and resulted in inflated financial results for Kidder Peabody.  GE reported the fraudulently inflated financial results of Kidder Peabody to investors in its financial statements.  The plaintiffs in that case argued that GE's reporting of the false earnings was highly unreasonable or reckless because GE had failed to investigate the validity of the subsidiary's extremely favorable financial results.

The Second Circuit rejected the plaintiffs' argument, finding that "[g]iven the significant burden on the plaintiff in stating a fraud claim based on recklessness, the success, even the extraordinary success, of a subsidiary will not suffice in itself to state a claim that the parent was reckless in failing to further investigate[, and] [f]raud cannot be inferred simply because [the parent corporation] might have been more curious or concerned about the activity at [its subsidiary]."  Id. at 270.  Furthermore, in Kushner v. Beverly Enterprises, Inc., 317 F. 3d 820 (8th Cir. 2003), the Eighth Circuit noted that "'the failure of a parent company to interpret extraordinarily positive performance by its subsidiary ⋯ as a sign of problems and thus to investigate further does not amount to recklessness under the securities laws'."  Id. at 829, quoting Novak v. Kasaks, 216 F. 3d 300, 319 (2d Cir. 2000).  See also In re Comshare, Inc. Securities Litigation, 183 F. 3d 542 (6th Cir. 1999), where the Sixth Circuit cited Chill for the proposition that courts "should not presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls."  Id. at 554.  More recently, in a similar situation, In re Stonepath Group, Inc. Securities Litigation, 2006 WL 890767 (E.D.Pa., Apr. 03, 2006), citing Chill, Kushner and Comshare, among other decisions, the district court held:

Thus, even though we accept that Domestic Services was the more important of Stonepath's two subsidiaries and that Air Plus's earnings were key to Stonepath's profitability from 2001 to 2003, the relevant jurisprudence prevents us from reflexively imputing to the Individual Defendants knowledge of a subsidiary's under-reporting of transportation costs.

2006 WL 890767, at * 13.

B.     The Moscow Rebuttal Is A Proper Riposte To Mr. Dages On Such Issues.

On October 4, 2006, CMS served plaintiffs with the Moscow Rebuttal.  Mr. Moscow is a senior corporate and securities partner at the law firm of Honigman Miller Schwartz & Cohn, has served as chairman of the Corporate Laws Committee and Business Corporation Act Revision Subcommittee of the State Bar of Michigan (among other positions), and otherwise qualifies as an expert with respect to the applicable standards of care governing the conduct of directors and officers of a Michigan corporation.  (See Moscow Rebuttal, p. 1, ¶ 1, & Ex. 2; Aaronoff Decl., Ex. "D.")

The opinions Mr. Moscow developed are summarized at page 2 of the Moscow Rebuttal:

(1) It is reasonable for a Michigan corporation and its officers and directors to rely on the advice of its outside auditors with respect to accounting for revenues and costs, including accounting for zero margin trading transactions.

(2) Institution of an investigation by the SEC of zero margin trading transactions by MS&T did not demonstrate that CMS and its directors and officers were reckless, even if CMS's stock price dropped following the disclosure of the investigation.

The text of the Moscow Rebuttal also discusses several additional underlying opinions developed by Mr. Moscow, based upon his review of the Dages Report and various other materials listed:

a)  The duties of Michigan directors and officers are generally classified as duties of care and loyalty, and nothing in the Dages Report refers to any conflict of interest or similar matter that would indicate a breach of the duty of loyalty in connection with zero margin trading activity.  (See Moscow Rebuttal, p. 3.)

b)  Michigan directors and officers, in discharging their duties under Michigan law, customarily rely upon public accountants as to matters the director or officer reasonably believes are within the accountants' professional expertise.  (See Moscow Rebuttal, pp. 45.)

c)  The Dages Report and the other materials reviewed by Mr. Moscow do not indicate that CMS officers or directors saw or should have seen "red flags" indicating accounting problems at MS&T in connection with zero margin trading, particularly given that AA was reviewing MS&T's financial statements in the ordinary course of preparation of consolidated financial statements for CMS, and given that CMS directors and officers were advised that the reporting practices of the subsidiary were consistent with practices of other companies in the industry.  (See Moscow Rebuttal, p. 6.)

As indicated above, the opinions expressed by Mr. Moscow weigh directly against the opinions admitted to by Mr. Dages in the Dages Report and deposition testimony previously discussed herein.  But, plaintiffs' counsel insist that Mr. Moscow's work must be stricken and ignored, based upon plaintiffs' assertions that CMS has sandbagged plaintiffs with a disguised affirmative report, and that Mr. Moscow has presented an entirely "legal" opinion that goes beyond the permissible scope of expert testimony at trial.

The cases advanced by plaintiffs do not support any such conclusions.  First, plaintiffs cite Daly v. Far Eastern Shipping Co. PLC, 238 F. Supp. 2d 1231, 1240-41 (W.D. Wash. 2003) for the notion that the opinions formed by Mr. Moscow do not respond to any opinions expressed

11

by Mr. Dages in connection with the Dages Report.  But, the situation in <u>Daly</u> does not apply here because, (1) unlike the proponent of rebuttal testimony in that case, CMS has identified various elements of Mr. Dages' opinions that are countered by the Moscow rebuttal, and (2) in <u>Daly</u>, the purported rebuttal testimony was interposed only one week before trial, which the court found extremely prejudicial to the interests of the opposing party.

<u>Daly</u> concerned a claim by plaintiff that, while photographing defendants' merchant vessel on behalf of the U.S. Navy, a laser emitted from the vessel struck him in the eye, causing him permanent eye damage.  Plaintiff designated an expert (Kessler) to give testimony about whether plaintiff's photograph of the vessel showed a laser or merely a navigational light.  One major thrust of Kessler's report was his critique of the so-called Dalgren Report, an analysis by the U.S. Navy of plaintiff's photograph.  The Dalgren Report had compared photographs of lasers to the image in plaintiff's photograph, and concluded that plaintiff's photograph did not show a laser.  238 F. Supp. 2d at 1239.  Kessler's report identified ten specific flaws in the Dalgren Report's methodology, and concluded that it was hence unreliable in concluding that there had been no laser.  Defendants responded to Kessler's report with a report by Siegman, which concluded that the Dalgren Report was sound and addressed Kessler's discussion of alleged flaws in the Dalgren Report.

On the deadline for plaintiff's expert rebuttal report (one week before trial), plaintiff produced an "addendum" to Kessler's report.  Part of the addendum responded directly to statements in Siegman's report.  But, the addendum also reported for the first time the results of a new experiment that Kessler had conducted where he took his own pictures of a laser and compared them to plaintiff's photograph.  Based upon that experiment, Kessler concluded that he had found a new flaw in the Dalgren Report.  Defendants argued in limine that opinions based on

Kessler's new experiment should be excluded because the experiment was not proper rebuttal to Siegman's report.  The court ruled that some of the testimony in Kessler's addendum was proper rebuttal to Siegman's report and would be admitted.  But, the court refused to admit testimony on Kessler's new experiment, because that experiment simply identified a new flaw in the Dalgren Report, which can and should have been presented in Kessler's initial report, and did not touch on any issue raised by the later Siegman report.  Indeed, plaintiff was unable to identify any portion of the Siegman report that was arguably rebutted by the new experiment, and thus the court found the submission of testimony on the new experiment a tactic "highly prejudicial to defendants [that] could not be allowed."  238 F. Supp. 2d at 1241.

Next, plaintiffs direct the Court to the opinion in Sommer v. Davis, 317 F. 3d 686, 691-92 (6th Cir. 2003), for the (wholly incorrect) contention that CMS submitted the Moscow Rebuttal after the expiration of a relevant expert-disclosure deadline.  However, the portion of the Sommer opinion pin-cited by plaintiffs is inapposite.  In Sommer, a medical malpractice case concerning alleged violations of the standard of care by Nashville, Tennessee physicians, the court had set (after multiple extensions), a final expert-disclosure deadline of July 15, 2000.  However, without offering any explanation or justification, plaintiffs waited until February 26, 2001 (less than three months before the May 2, 2001 trial date) to disclose a Dr. Loomis as an expert.  317 F. 3d at 692.  The Sixth Circuit affirmed the district court's grant of defendants' motion in limine, noting that there was no indication of an honest mistake on plaintiffs' part, that defendants had had no prior notice of Dr. Loomis's potential involvement or his opinions, and that plaintiffs had specifically waived any opposition to a defense motion in limine to bar Dr. Loomis from testifying.  Id.  Here, CMS served the Moscow Rebuttal on plaintiffs' counsel on the agreed-upon date (October 4, 2006) for exchange of rebuttal reports, along with the Tabak

13

Rebuttal and a rebuttal report prepared by another CMS expert, Dr. Bradford Cornell, and

plaintiffs' counsel served their own rebuttal report (from Mr. Dages) that same day.  (Aaronoff

Decl., ¶ 4.)  The parade of horribles detailed in <u>Sommer</u> is irrelevant.

Finally, plaintiffs contend that Mr. Moscow should not be permitted to testify in this

action because the opinions expressed in the Moscow Rebuttal consist of legal analysis that

would do "little more than tell the jury what result to reach" and would "invade the province of

the court to determine the applicable law and to instruct the jury as to that law[,]" citing <u>Woods

v. Lecureux</u>, 110 F. 3d 1215, 1220 (6th Cir. 1997) and <u>Torres v. County of Oakland</u>, 758 F. 2d

147, 150-51 (6th Cir. 1985).  However, plaintiffs here give an inaccurate, misleading and

simplistic view of this important evidentiary issue.

The Sixth Circuit has recognized that under Federal Rule of Evidence 704, an expert

witness is permitted to testify in the form of an opinion as to an "ultimate issue of fact."  <u>United

States v. Zipkin</u>, 729 F. 2d 384, 386-87 (6th Cir. 1984); <u>Donnelly Corp. v. Gentex Corp.</u>, 918 F.

Supp. 1126, 1137 (W.D. Mich. 1996).  In <u>Gentex Corp.</u>, for example, a patent case, the district

court found that the ultimate issues of fact included "whether the claims of the '112 patent were

infringed by Gentex products, whether those claims are valid, whether Donnelly meets the legal

requirements to be awarded lost profit damages, and the amount of royalty which would be

reasonable in this matter."  918 F. Supp. at 1137.  The Tenth Circuit, reaching the same

conclusion, discussed the issue in this manner:

> "The line we draw here is narrow. We do not exclude all testimony regarding legal
> issues.  We recognize that a witness may refer to the law in expressing an opinion
> without that reference rendering the testimony inadmissible.  Indeed, a witness may
> properly be called upon to aid the jury in understanding the facts in evidence even though
> reference to those facts is couched in legal terms."

Specht v. Jensen, 853 F. 2d 805, 809 (10th Cir. 1988).  In Specht, a case involving a suit for

damages under federal civil rights law grounded on allegedly invalid searches of the plaintiffs'

home and office, the Tenth Circuit affirmed the admissibility of expert testimony by an attorney

as to whether he believed that an illegal search had occurred:

> ". . .[A]n expert's testimony is proper under Rule 702 if the expert does not attempt to
> define the legal parameters within which the jury must exercise the fact-finding function.
> However, when the purpose of testimony is to direct the jury's understanding of the legal
> standards upon which their verdict must be based, the testimony cannot be allowed.  In
> no instance can a witness be permitted to define the law of the case.  [¶]  Plaintiffs seek
> to avoid this conclusion by arguing the expert testimony here was no different from a
> medical expert testifying that specific conduct constitutes medical malpractice.  We do
> not believe, however, there is an analog between the testimony of the medical expert
> and that of the legal expert because the former does not usurp the function of the court.
> The testimony of the medical expert in plaintiffs' hypothetical is more like that of the
> legal expert who explains a discrete point of law which is helpful to the jury's
> understanding of the facts."

853 F. 2d at 809-10.

These principles have been applied to admit expert testimony on legal issues in a variety

of situations.  See Huddleston v. Herman & MacLean, 640 F. 2d 534, 552 (5th Cir. 1981),

modified on other grounds, 459 U.S. 375, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983) (attorney

expert in securities law allowed to testify that a statement in a prospectus was standard language

for issuance of a new security because this information helped the jury weigh the evidence of

defendants' scienter); United States v. Buchanan, 787 F. 2d 477, 483 (10th Cir. 1986) (court

permitted legal expert to testify that a certain weapon had to be registered with federal bureau);

Oxford Gene Technology Ltd. V. Mergen Ltd., 345 F. Supp. 2d 431, 442-43 (D. Del. 2004)

(attorney expert with 18 years experience as practitioner and in-house corporate counsel was

permitted in patent infringement case to testify as to actions that a reasonable corporation takes

on learning of a patent relevant to its business); Lewis v. New Mexico Dept. of Health, 275 F.

Supp. 2d 1319, 1330-31 (D. N.M. 2003) (attorney permitted to testify as expert re differences between certain types of programs and the history of such services).

Here, if and when Mr. Moscow testifies before a jury on these matters, he will obey the legal guidance articulated in these decisions, such as by the Western District of Michigan in Gentex Corp.:  "Therefore, such experts must walk a fine line: they must give their expert opinions on ultimate issues of fact, while explaining their own understandings of the law, but without purporting to give expert opinions as to what the law is."  918 F. Supp. at 1137.

### III.    THE TABAK REBUTTAL IS LIKEWISE ENTIRELY PROPER AND UNOBJECTIONABLE.

Plaintiffs devote a single sentence of their brief to arguing that the Tabak Rebuttal should be stricken, stating only, "That report liberally cites (and thus is improperly based upon a lay witness's understanding of ) case law."  (Plaintiffs' opening brief, p. 4.)

First, the Tabak Rebuttal, a 27-page document responding to the Dages Report, cites to case law in three places:

1.     At footnote 20 on pages 8-9, Dr. Tabak states as follows:

Removal of the portions of a price decline for which defendants could not be held liable is a long-established portion of a proper damages methodology,  See, for example, *In re Imperial Credit Industries, Inc. Securities Litigation*, 252 F. Supp. 1005, 1014 (C.D. Cal. 2003) *aff'd sub. nom. Mortensen v. Snavely*, *145 Fed. Appx. 218 (9th Cir. 2005)* ("Because of the need 'to distinguish between the fraud-related and non-fraud related influences o[n] the stock's price behavior,' *In re Oracle Sec. Litig*., 829 F. Supp. 1176, 1181 (N.D. Cal. 1993), a number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar."); *In re Executive Telecard*, 979 F. Supp. 1021 (S.D.N.Y. 1997) ("…a proper methodology for eliminating that portion of a price decline that is the result of forces unrelated to the wrong, should include elimination for both general market factors and company specific factors."); and *Howard Miller v. Thane International, et al.*, (C.D. Cal. 2005) Case No. SACV 03-1031-JVS (SGLx) ("…the Court finds that Preston could and should have factored out, at least to some degree, these effects in order to determine the effect of the alleged misrepresentation on

16

Thane's share price.  The Court, therefore, finds Preston's failure to even attempt to control for or quantify such factors unacceptable under <u>Imperial Credit</u>.  See F. Supp. at 1016 (holding that an expert's opinion must take into account 'market events for which Defendants cannot be held responsible' and must 'eliminate that portion of the price decline of [the] stock which is unrelated to the alleged wrong.')  The failure to factor out the effect of known events is not merely one of degree to be brought out on cross-examination, but represents a fundamental flaw which invalidates Preston's damage calculation.")

As a threshold matter, the idea advanced by Dr. Tabak in footnote 20 (which he could have done without appending, and therefore is not based upon, legal citation) is not controversial.  In fact, Mr. Dages <u>expressly</u> <u>agreed</u> with Dr. Tabak in deposition, stating that if plaintiffs' internal control allegations were not part of the remaining claims in this action, that

> would require [him] to go back to these abnormal returns and take another look at each one of those abnormal returns. . . [to] determine whether it's still reasonable to allocate a hundred percent of that abnormal return to the remaining elements of the claim or whether you should say now all right, internal controls are out of the claim or out of the case and therefore only 50 percent of this day's return is attributable to the remaining elements of the claim.

(Dages Transcript, 166:4-19.)

Second, the Tabak Rebuttal nowhere opines that the caselaw cited in footnote 20 is binding upon this Court; rather, Dr. Tabak merely notes that the proposition supported by the case decisions listed is long-established and explicitly refers to the decisions as "example[s]."

2.       On page 16 of the Tabak Rebuttal, Dr. Tabak cites to page 9 of this Court's own ruling in this action on March 24, 2006 regarding plaintiffs' amended motion for class certification, where the Court determined that internal management control problems are not an appropriate part of a Section 10(b) claim.[6]

---

[6] Because plaintiffs' opening brief cited only page 16 of the Tabak Rebuttal, CMS assumes that it does not reference the Tabak Rebuttal's reference to <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 125 S. Ct. 1627 (2005).  The Tabak Rebuttal mentioned <u>Dura</u> in footnote 28 at page 15, stating, "While I do not intend to opine on the legal meaning of <i>Dura</i>, I do plan to discuss the economic interpretation of the analyses in the Dages Report so that the Court or the

Moreover, Dr. Tabak cited this Court's ruling only while critiquing Mr. Dages' stated reason, itself a legal conclusion, in deposition for including the internal control allegations in his damages conclusion: "I don't know that that qualified as an order from the court."  (Dages Transcript, 213:20 – 214:3.)  Thereafter, Dr. Tabak stated:

> While I offer no legal opinion, I do note that in all of my previous experiences, a damages expert reading a document from a court entitled "Order and Opinion" would consider that to qualify as an order from the court; at the very least, the expert should seek and disclose advice from counsel before calculating damages based on assumptions that are at odds with a plain reading of a document entitled Opinion and Order.

(Tabak Rebuttal, p. 16.)

   3.    At footnote 34 on page 18 of the Tabak Rebuttal, Dr. Tabak cites caselaw for the third and final time, while criticizing the Dages Report argument that a longer history of allegedly inflated revenues would not create a larger stock price effect than a single period of inflated revenues, stating:

> In contrast, there have been statements of support for a "build-up" method by which the amount of inflation rises with the amount of cumulative misrepresentations.  See, e.g., *In re California Micro Devices Securities Litigation*, 965 F. Supp. 1367 (N.D. Cal.) (". . . the plan presented here is by far the most thorough, sophisticated and well substantiated such plan that the court has yet seen in a securities class action.") and *In re Cendant Corporation Securities Litigation*, No. CIV.98-1664 (WHW) (approving a plan with a build-up over objections from investors who did not get a claim as a result of the damages methodology).

(Tabak Rebuttal, p. 18, fn. 34.)

   Again, as noted in connection with the first instance in which Dr. Tabak cited caselaw, he does not argue that the case decisions mentioned are binding upon this Court or the basis of his conclusions; rather, he notes that the cases cited in the footnote stand as examples of statements of support for a proposition put forth in the main text of the Tabak Rebuttal.

---

finder of fact can compare Mr. Dages' analyses to the relevant case law."  There, the Tabak Rebuttal references the relevant case law so that the reader can understand why certain portions of Mr. Dages' analyses are discussed.

Last, separate and apart from the plain misreadings that characterize plaintiffs' argument to strike the Tabak Rebuttal, it is flatly disingenuous for plaintiffs' counsel to contend that an expert offering a methodology for determining whether securities fraud damages are present should be barred from testifying or offering an expert report, simply because that report happens to mention any of the various case decisions from around the country where district and appellate judges have had to determine contested issues (e.g., class certification, or summary judgment) in which the opposing parties' damages models are implicated.

Indeed, as plaintiffs' counsel are undoubtedly aware, there are case decisions where courts have criticized securities damages experts for failing to cite enough caselaw in support of their analyses.  See, e.g., In re Enron Corporation Securities, Derivative & "ERISA" Litigation, MDL-1446, Civ. Action No. H-01-3624, 2006 U.S. Dist. LEXIS 43146, Order and Opinion re Class Certification (S.D. Tx. June 5, 2006).  In that opinion, Judge Harmon, at footnote 145, criticizes an expert for citing caselaw support in a report regarding definitions of two recognized characteristics of an "efficient equity market" (i.e., "open" and "well-developed") but failing to cite any caselaw in support of the definition for the third listed factor ("impersonal").  2006 U.S. Dist. LEXIS at * 364, n. 145.  Perhaps, as far as plaintiffs are concerned, for a defense expert, it is "damned if you do, damned if you don't."

Moreover, Mr. Dages himself testified that he has reviewed and considered legal precedent and thus, by plaintiffs' own logic, bases his analyses upon his own lay witness understanding of case precedent, exactly as plaintiffs allege concerning Dr. Tabak:

"A.      * * * so oftentimes right from the very start there is legal precedent that's been raised and either by the court or by the attorneys it has been deemed relevant, so we wrap that in right from the beginning.

Q.      And in your experience is it common and accepted practice for an expert such as

yourself to review and consider legal precedent in your work?

A.      Yes, I'd say it would be advisable."

(Dages Transcript, 55:19 – 56:5; emphasis added.)

**IV.    CONCLUSION**

Plaintiffs' Motion to Strike should be denied.

> Respectfully submitted:
>
> MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
>
>
> s/Todd A. Holleman
> Thomas R. Cox
> Todd A. Holleman
> 150 West Jefferson, Suite 2500
> Detroit, MI 48226
> (313) 963-6420
> holleman@millercanfield.com
> Attorneys for defendant
> CMS Energy Corporation

Dated:  October 27, 2006

ORC 399292-1.054200.0025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on <u>October 27, 2006</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

- **Patrick E. Cafferty**
  pcafferty@millerfaucher.com pecafferty@aol.com

- **Robert N. Cappucci**
  rcappucci@entwistle-law.com wwickersham@entwistle-law.com,vcappucci@entwistle-law.com

- **Gregory A. Clifton**
  gclifton@durkinmcdonnell.com carrie@durkinmcdonnell.com

- **Thomas R. Cox**
  cox@millercanfield.com grainger@millercanfield.com

- **Clifford S. Goodstein**
  cgoodstein@milbergweiss.com

- **Sheldon H. Klein**
  klein@butzel.com

- **Krista L. Lenart**
  klenart@dykema.com akehrerbates@dykema.com

- **Daryl A. Libow**
  libowd@sullcrom.com

- **Joseph J. McDonnell**
  jmcdonnell@durkinmcdonnell.com carrie@durkinmcdonnell.com

- **E. Powell Miller**
  emiller335@aol.com kds@millershea.com

- **Marc L. Newman**
  mln@milllawpc.com asl@millerlawpc.com

- **Clarence L. Pozza, Jr**
  pozza@millercanfield.com grainger@millercanfield.com

- **Joseph J. Reilly**
  reillyj@sullcrom.com kosae@sullcrom.com

- **James K. Robinson**
  jim.robinson@cwt.com

- **Richard A. Rossman**
  rossmanr@pepperlaw.com kuschj@pepperlaw.com

- **Ryan T. Scarborough**
  rscarborough@wc.com

- **Elwood S. Simon**
  esimon@esimon-law.com hazmcintyre923@yahoo.com

- **Neil A. Steiner**
  neil.Steiner@dechert.com luis.lopez@dechert.com

- **James D. VandeWyngearde**
  vandewyj@pepperlaw.com kuschj@pepperlaw.com

- **Robert A. Wallner**
  rwallner@milbergweiss.com

- **Stephen Wasinger**
  sfw@sfwlaw.com kfiema@kickhamhanley.com,ccoon@kickhamhanley.com

- **Michael G. Wilson**
  mgwilson@cmsenergy.com

- **John P. Zuccarini**
  zuccarinis@aol.com hazmcintyre923@yahoo.com

and I hereby certify that I will electronically mail the paper to the following non-ECF participants on
<u>October 27, 2006</u>:

| | |
|---|---|
| Andrew L. Barroway, Esq.<br>Schiffrin & Barroway, LLP<br>280 King of Prussia Road<br>Radnor, Pennsylvania 19087<br>abarroway@sbclasslaw.com | Lewis J. Liman<br>Cleary, Gottlieb, Steen & Hamilton<br>One Liberty Plaza<br>New York, NY 10004<br>lliman@cgsh.com<br>jjordan@cgsh.com |
| Christian T. Kemnitz<br>Steven L. Bashwiner<br>Katten, Muchin and Zavis<br>525 W. Monroe Street, Ste. 1600<br>Chicago, IL 60661-3693<br>Christian.kemnitz@kattenlaw.com<br>Steven.bashwiner@kattenlaw.com | John J. Ronayne, III<br>Bernardi, Ronayne<br>535 Griswold, Ste. 1028<br>Detroit, MI 48226-3686<br>johnr@brgpc.com |

|  |  |
|---|---|
| Jeffrey C. Block<br>Julie A. Richmond<br>Berman, DeValerio, Pease, Tabacco,<br>Burt & Purcillo<br>One Liberty Square<br>Boston, MA 02109 | Samuel H. Rudman<br>Steven G. Schulman<br>Milberg, Weiss, Bershad & Schulman, LLP<br>One Pennsylvania Plaza, 49th Floor<br>New York, NY 10119-0165<br>sschulman@milbergweiss.com<br>srudman@milbergweiss.com |
| John P. Zucarini<br>Elwood S. Simon Assoc.<br>355 S. Woodward Avenue, Ste. 350<br>Birmingham, MI 48009<br>hazmcintyre923@yahoo.com | Samuel C. Damren<br>Dykema Gossett<br>400 Renaissance Center<br>Detroit, MI 48243-1668<br>sdamren@dykema.com |
| Jeffrey A. Klafter<br>Bernstein, Litowitz, Berger<br>& Grossmann, LLP<br>1285 Avenue of the Americas, 33rd Floor<br>New York, NY 10019<br>jak@klafterolsen.com | Vincent R. Cappucci, Esq.<br>William Wickersham<br>ENTWISTLE & CAPPUCCI, LLP<br>299 Park Avenue<br>New York, NY  10171-1499<br>vcappucci@entwistle-law.com<br>wwickersham@entwistle-law.com |
| Philip J. Kessler<br>Butzel Long<br>150 W. Jefferson, Ste. 100<br>Detroit, MI  48226<br>kessler@butzel.com | Shari Steinberg<br>Dechert, LLP<br>30 Rockefeller Plaza<br>New York, NY  10112<br>Shari.steinberg@dechert.com |

s/Todd A. Holleman
Todd A. Holleman (P57699)
Miller, Canfield, Paddock & Stone, P.L.C.
150 W. Jefferson, Suite 2500
Detroit, MI 48226
313-496-7861
holleman@millercanfield.com

DELIB:2787039.1\013348-00025